# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

| | |
|---|---|
| ELEGANT MASSAGE, LLC d/b/a LIGHT STREAM SPA, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM FIRE AND CASUALTY COMPANY, <br><br> Defendants. | Civil Action No. 20-cv-00265-RAJ <br><br><br> **FIRST AMENDED CLASS ACTION COMPLAINT AND <u>DEMAND FOR JURY TRIAL</u>** |

The allegations herein are based on personal knowledge as to Plaintiff's own conduct and are made upon information and belief as to all other matters based on an investigation by counsel:

## I.     INTRODUCTION

1.     Plaintiff Elegant Massage, LLC d/b/a Light Stream Spa ("Plaintiff") brings this class action against Defendants State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company ("Defendants"), individually and on behalf of all persons or entities in the United States who purchased State Farm-branded "all risk" commercial property insurance policies that included Loss of Income and Extra Expense Coverage and were denied claims for lost business income and/or extra expenses as a result of social distancing, closure and/or stay-at-home orders issued from March 2020 forward.

2.     Plaintiff owns and operates Light Stream Spa, which provides therapeutic massages to customers in the Virginia Beach area.

3.     To protect itself against an unexpected interruption to its business, Plaintiff purchased an "all risk" commercial property insurance policy from Defendants in 2019 (the "Policy"). *See* Exhibit A. The Policy broadly covers "Loss of Income and Extra Expense Coverage," and includes coverage for the losses described herein. Specifically, the Policy provides coverage for "Loss of Income" and "Extra Expense" due to accidental direct physical loss to property and for the "Loss of Income" and "Extra Expense" caused by certain actions of a "Civil Authority." *See* Exhibit B. Under these coverages, if for any non–excluded reason, there is a "suspension" of "operations" at Plaintiff's business or if a civil authority "prohibits access" to the Plaintiff's business, Defendants promised to pay Plaintiff's lost income and extra expenses. *See id*. Accordingly, Light Stream Spa, understandably believed that the Policy would protect its

1

business in the event that its operations were suspended as a result of: (1) social distancing, closure and/or stay-at-home orders; (2) customers being unable to visit the business to purchase services; and/or (3) any other covered loss.

4.      Property of Plaintiff and members of the Classes suffered accidental direct physical loss.

5.      Plaintiff and members of the Classes were also prohibited from accessing their property due to orders issued by civil authorities.

6.      Plaintiff fully performed its obligations under the Policy, including but not limited to, paying all premiums that were due to Defendants. The Policy, which remains in force as of today, promised Plaintiff the reimbursement of lost income and extra expenses in the event that its business was suspended or in the event that Plaintiff was prohibited from accessing its property.

7.      Beginning in March 2020 and continuing to the present, Plaintiff, and other similarly–situated individuals and businesses, suffered a dramatic financial hit. In the midst of the COVID-19 global pandemic, states and localities across the nation, including the Commonwealth of Virginia, issued orders that limited human interaction and required residents to stay at home. These social distancing, closure and/or stay-at-home orders have suspended the operations of businesses, like Plaintiff, resulting in lost income and extra expenses.

8.      In Virginia, a state of emergency was declared in early March, followed by a series of social distancing restrictions and closures. Notably, on March 17, 2020, the Governor of Virginia issued an order limiting the number of patrons permitted in certain businesses. Thereafter, on March 23, 2020, the Governor issued an order closing all recreational and entertainment businesses, including spas and massage parlors, such as Light Stream Spa. And, on

March 30, 2020, the Governor ordered all individuals to remain at their place of residence, except when engaging in certain necessary activities.

9.      As a result of these social distancing, closure and/or stay-at-home orders issued by the Governor of Virginia, Plaintiff was forced to suspend its operations entirely. This has resulted in a significant loss of income and has caused Plaintiff to incur extra expenses.

10.     Given this complete suspension of its operations as a direct result of the aforementioned social distancing, closure and/or stay-at-home orders, which also prohibited access to Plaintiff's property due to physical loss at other properties, Plaintiff timely tendered a claim to Defendants seeking reimbursement for its lost income and extra expenses under the Policy's Loss of Income and Extra Expense Coverage. *See* Exhibit A.

11.     Two days after Light Stream Spa submitted its claim, Defendants summarily denied Plaintiff's claim, refusing to provide any reimbursement and claiming that Plaintiff's loss was excluded from coverage without conducting any investigation. *See* Exhibit B. This denial was part of a scheme by Defendants to deny all claims based on social distancing, closure and/or stay-at-home orders. Defendant's denial of coverage was not tethered to Light Stream Spa's claim, which Defendants did not investigate, or the specific coverage provided for in the Policy and was wrongful.

12.     The Policy contains numerous ambiguous terms. For example, there is no definition of "Virus" in the Policy. There is also no definition of "accidental direct physical loss" or "accidental direct physical loss to property" in the Policy.

13.     Moreover, the Virus Exclusion in the Policy does not apply to the claims of Plaintiff or members of the Classes. The Virus Exclusion only excludes losses resulting from the "growth, proliferation, spread or presence" of a "[v]irus, bacteria or other microorganism that

3

induces or is capable of inducing physical distress, illness or disease." There was no "growth, proliferation, spread or presence" of a "[v]irus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness or disease" on Plaintiff's property at any relevant time.

14.     There is no evidence that COVID–19 entered Plaintiff's property or that the property had to be de–contaminated. Rather, the sole causes of Plaintiff's loss were the social distancing, closure and/or stay-at-home orders.

15.     In addition, the premise under which the Virus Exclusion was included in standard–form–all–risk policies, like the one at issue, was the opposite of the risk here. The exclusion was written in 2006 to add to the pollution and asbestos contamination exclusions. Given the patent and latent ambiguities in the exclusion, including clear admissions to insurance regulators that the exclusion was meant to apply only to claims for de–contamination costs and would not reduce the coverage provided under these policies, the Virus Exclusion should be construed against Defendants and is inapplicable here.

16.     Defendants have refused to, or on information and belief will refuse to, honor their obligations under the Policy and substantially identical policies purchased by other members of the putative Classes.

17.     Light Stream Spa seeks damages for breach of contract and breach of the implied covenant of good faith and fair dealing against Defendants. Plaintiff also seeks a declaration that the Virus Exclusion is inapplicable, and/or procured through fraud or misrepresentation, and therefore void.

## II.     JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) because: (i) this is a class action, including

claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; (ii) there are thousands of potential class members; (iii) the aggregate amount in controversy exceeds the jurisdictional amount of $5,000,000.00; and (iii) members of the Classes are citizens of States different from Defendants.

19.     This Court has personal jurisdiction over Defendants, because Defendants have submitted to jurisdiction in this District by marketing, advertising and selling insurance policies, including the insurance policy sold to Plaintiff, within this District, including through numerous agents doing business in Virginia. Defendants' actions, denying Plaintiff's insurance claim, have further caused harm to Plaintiff, a Virginia resident, as well as members of the class residing in Virginia. In addition, Defendants exercise substantial, systematic and continuous contacts with the District by doing business in this District.

20.     This Court has jurisdiction to grant declaratory relief under 28 U.S.C. § 2201 because an actual controversy exists between the parties as to their respective rights and obligations under the Policy.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred within this District and/or a substantial part of the property that is the subject of this action is situated within this District.

## III.     PARTIES

22.     Plaintiff Elegant Massage, LLC, doing business as Light Stream Spa, is a Virginia corporation and with its principal place of business located at 665 Newtown Road, Suite 114, Virginia Beach, Virginia 23462.

23.     Defendant State Farm Mutual Automobile Insurance Company is organized under the laws of the State of Illinois and licensed in all 50 states, the District of Columbia, and the provinces of Alberta, New Brunswick, and Ontario. Defendant State Farm Mutual Automobile

Insurance Company's corporate headquarters is located at One State Farm Plaza, Bloomington, IL 61710.

24.     Defendant State Farm Fire and Casualty Company is organized under the laws of the State of Illinois. Defendant State Farm Fire and Casualty Company provides property insurance for State Farm customers in the United States and the product lines that it writes include homeowners, boat owners and commercial lines. Defendant State Farm Fire and Casualty Company's corporate headquarters is located at One State Farm Plaza, Bloomington, IL 61710. State Farm Fire and Casualty Company is part of a family of State Farm insurance and financial services companies that serve tens of millions of customers and offer over 100 products. According to State Farm's public filings and statements, in 2019, the State Farm property and casualty insurance companies earned premiums of $64.8 billion.

## IV.     FACTUAL ALLEGATIONS

### A.     Plaintiff Purchased an "All Risk" Policy that Provides Broad Coverage

25.     As part of prudent business practices, Light Stream Spa maintains insurance coverage. Light Stream Spa specifically maintains an "all risk" policy with Defendants. This policy is the broadest property insurance coverage available.

26.      As described below in greater detail, the Policy at issue provides coverage for "all risk" for "accidental direct physical loss" unless the loss is excluded. An endorsement to the Policy provides Light Stream Spa with loss of business income and extra expense coverage.

27.     Although the Policy does not define the phrase "accidental direct physical loss," the plain language of this phrase indicates that coverage is triggered when a covered cause of loss threatens or renders property unusable or unsuitable for its intended purpose or unsafe for normal human occupancy or continued use.

28.     Although the Policy includes no definition of "virus," the plain language of the

Virus Exclusion, including its exclusion of "growth, proliferation, spread or presence" makes it inapplicable here.

29.     The Policy explicitly provides coverage for losses and extra expenses "caused by action of a civil authority that prohibits access to the [property]."

30.     The Policy provides no exclusion for a pandemic or infectious disease.

31.     The Policy provides no exclusion for social distancing, closure and/or stay–at–home orders.

32.     Light Stream Spa paid all premiums owed to the Defendants.

33.     The Policy is a form policy prepared by and issued by the Defendants.

34.     No exclusions apply to Plaintiff's claim and Plaintiff's claim is a covered loss.

35.     Members of the putative Classes purchased insurance policies from Defendants providing for the same loss of income and extra expense coverage and using the same policy provisions and suffered the same injury as Plaintiff through Defendants' wrongful denial of claims.

36.     Plaintiff and members of the Classes submitted timely notice of their claims to Defendants.

### B.     The COVID-19 Global Pandemic and Social Distancing, Closure and/or Stay at Home Orders

37.     In December 2019, a novel strain of SARS-CoV-2 was first reported in Wuhan, Hubei province, China. The infectious disease, COVID–19, quickly spread to many other countries, including the United States.

38.     COVID–19 is highly contagious, uniquely resilient, and deadly.

39.     The World Health Organization ("WHO") states "[t]he disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a

person with COVID-19 coughs, sneezes, or speaks . . . People can catch COVID–19 if they breathe in these droplets from a person infected with the virus . . . [and] droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails. People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth."

40.   Similarly, the Centers for Disease Control ("CDC") states that COVID-19 is "thought to spread mainly from person–to–person."[1] The CDC recommends that everyone should avoid close contact with others and wash hands often, among other preventative measures.

41.   While infected droplets and particles carrying COVID-19 may not be visible to the naked eye, they are physical objects that travel to other objects and cause harm. Habitable surfaces on which COVID-19 has been shown to survive include, but are not limited to, stainless steel, plastic, wood, paper, glass, ceramic, cardboard, and cloth.

42.   According to a study published in The New England Journal of Medicine, COVID-19 is widely accepted as a cause of real physical loss. It remains stable and transmittable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel.[2]

43.   In a March 4, 2020 research letter published by the Journal of the American Medical Association, a scientist from Singapore's National Centre for Infectious Disease and DSO National Laboratories, discussed research showing that COVID-19 was found in the majority of uncleaned hospital rooms previously occupied by a patient with COVID-19. The scientist concluded that "[s]ignificant environmental contamination by patients with SARS-CoV-

---

[1]   *How to Protect Yourself & Others*, CDC (Updated Apr. 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html.

2 through respiratory droplets and fecal shedding . . . supports the need for strict adherence to environmental and hand hygiene."[3]

44.     On their corporate webpage, Defendants admit that COVID-19 disrupted normal business operations, and advise their customers to rely on the guidance from the CDC referenced above, and to consider Occupational Safety and Health Administration guidelines regarding employee's health and safety during the pandemic.[4] Defendants have also acknowledged the physical dangers associated with COVID–19, advising auto body shops that they will reimburse labor and materials "expended cleaning vehicles as a precaution against . . . COVID–19."[5]

45.     On March 11, 2020, the World Health Organization declared the COVID-19 outbreak a global pandemic, and on March 12, 2020, the Governor of Virginia, Ralph S. Northam, declared a state of emergency.

46.     States across the country joined Virginia in recognizing the serious and unprecedented danger posed by COVID–19, with California, Nevada, Arizona, Utah, Oregon and Texas also declaring states of emergency in early March 2020.

47.     By mid-March 2020, there were thousands of confirmed COVID-19 cases in the United States. On March 16, 2020, in order to slow the spread of the infectious disease, which

---

[2] *New coronavirus stable for hours on surfaces*, Nat'l Inst. Of Health (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces.

[3] Sean Wei Xiang Ong, et al., *Air, Surface Environmental, and Personal Protective Equipment Contamination by Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) From a Symptomatic Patient*, JAMA (Feb. 27, 2020), https://jamanetwork.com/journals/jama/fullarticle/2762692.

[4] *Resources to help businesses respond to COVID-19*, State Farm, https://www.statefarm.com/simple-insights/small-business/resources-to-help-businesses-respond-to-COVID-19 (last visited July 10, 2020).

[5] John Huetter, *State Farm, USAA described approved charged for COVID–19 cleaning*, Repairer Driven News (Apr. 20, 2020), https://www.repairerdrivennews.com/2020/04/20/state-farm-usaa-describe-approved-charges-for-covid-19-cleaning/.

threatened to overwhelm healthcare systems throughout the country—and in response to research indicating that the infectious disease spreads primarily through close proximity between people—President Donald J. Trump and the CDC issued guidance recommending the implementation of "social distancing" policies, such as avoiding gatherings of more than ten people and the closure of certain businesses. Specifically, the CDC issued to the American public guidance titled "30 Days to Slow the Spread" of COVID–19. The guidance called for extreme social distancing measures, such as working from home, and staying away from bars and restaurants.

48.     On March 17, 2020, Governor Northam and the Virginia State Health Commissioner declared a public health emergency and restricted the number of patrons permitted in restaurants, fitness centers and theaters to ten or less.

49.     On March 23, 2020, Governor Northam issued Executive Order No. 53, which ordered the closure, effective March 24, 2020, of "recreational and entertainment businesses," including specifically "spas" and "massage parlors." The closure was initially set to expire on April 24, 2020, but it was extended by the Governor until May 8, 2020. Pursuant to subsequent orders discussed below, these closures began to be lifted, with strict specifications and limitations on reopening, on May 15, 2020.

50.     On March 30, 2020, Governor Northam issued Executive Order No. 55, which ordered all individuals in Virginia to stay at home unless carrying out necessary life functions.

51.     Nearly every state, including those in which putative members of the Classes do business, has issued similar compulsory orders requiring residents to stay home and for businesses to close or reduce operations.

52.     To date, all 50 states have issued emergency declarations, 49 states issued orders

banning large gatherings and/or issued orders limiting restaurant operations, 45 states issued orders requiring non–essential businesses to close, and 44 states issued state wide stay at home orders.[6]

53.     Even with these precautions, it has been reported that over 610,000 people have died worldwide. In the United States alone, over 140,000 have died, with more than 3.8 million people with confirmed infections. In Virginia alone, there have been over 78,000 confirmed infections and over 2,000 deaths.

54.     On May 8, 2020, the Governor issued Executive Order No. 61, which amended Executive Order Nos. 53 and 55 and, beginning on May 15, 2020, eased some of the restrictions therein. Under Executive Order No. 61, spas and massage centers were permitted to re-open as of May 15, 2020, subject to certain restrictions. Such restrictions include limiting occupancy to 50%, requiring six feet between workstations, requiring workers and patrons to wear face coverings, and requiring hourly cleaning and disinfection while in operation. To the extent that businesses are unable to comply with the restrictions in Executive Order No. 61, they are ordered to remain closed.

55.     On May 26, 2020, the Governor issued Executive Order No. 63, which required all patrons and employees of numerous business, including spas and essential retail businesses, to wear face coverings.

56.     On July 1, 2020, the Governor issued Executive Order No. 67 (collectively with Executive Order Nos. 51, 53, 55, 61, and 63 the "Orders"), which further eased some restrictions. However, under Executive Order No. 67, spas and massage centers as well as most other

---

[6] *State Data and Policy Actions to Address Coronavirus*, KFF (July 9, 2020), https://www.kff.org/coronavirus-covid-19/issue-brief/state-data-and-policy-actions-to-address-coronavirus/.

businesses, were still subject to certain restrictions including: requiring six feet between workstations, requiring workers and patrons to wear face coverings, and requiring hourly cleaning and disinfection while in operation. To the extent that businesses are unable to comply with these restrictions, they are still ordered to remain closed.

### C. Plaintiff's Business and Loss

57. Plaintiff owns and operates Light Stream Spa, which has provided therapeutic massage to customers in the Virginia Beach area since 2016.

58. As a result of the above-referenced social distancing, closure and/or stay–at–home orders in Virginia, Plaintiff closed Light Stream Spa on March 16, 2020 to protect its employees and the public. Governor Northam's subsequent March 23, 2020 closure order and March 30, 2020 stay-at-home order then mandated that Plaintiff must remain closed at least through May 15, 2020 and that customers could not visit the business to purchase services. Further, pursuant to Governor Northam's May 8, 2020, May 26, 2020, and July 1, 2020 orders, Plaintiff could only resume operations after implementing certain protocols and at reduced capacity.

59. Under these social distancing, closure and/or stay-at-home Orders, Light Stream Spa had to suspend operations and customers were not permitted to visit the business to purchase services, thereby preventing Plaintiff from making revenue.

60. Under the social distancing, closure and/or stay-at-home Orders, customers and employees were prohibited from travelling to or accessing Light Stream Spa's property, thereby prohibiting access to, use of, and operation of its business.

61. Under the social distancing, closure and/or stay-at-home Orders, employees were prohibited from working in close proximity to each other, thereby prohibiting access to, use of, and operations of Plaintiff's business.

62. Under the social distancing, closure and/or stay-at-home Orders, in order to

resume operations, Light Stream Spa had to stagger appointments, ensure all workstations were at least six feet apart, and engage in hourly disinfecting routines.

63.    Through no fault of its own, Plaintiff has suffered a substantial loss of income since March 16, 2020—a decrease attributable to the Orders—and has incurred extra expenses as a result of the Orders.

64.    Accordingly, Plaintiff has incurred, and continues to incur, among other things, a substantial loss of business income and extra expenses covered under the Policy.

65.    These extraordinary losses of business income and extra expenses (and concern for its employee's welfare) are precisely why Light Stream Spa took out "all risk" insurance with Defendants that included business interruption coverage, including the loss of income and extra expense coverage, which was meant to cover these losses.

### D.    The Insurance Policy

66.    In exchange for substantial premiums, on or about July 22, 2019, Defendants sold an insurance policy (Policy No. 96-C6- P556-2) to Plaintiff. The Policy is effective through July 22, 2020. A copy of the Policy is attached hereto as Exhibit A. Among other things, the Policy provided Loss of Income and Extra Expense Coverage. The Policy was prepared by Defendant State Farm Mutual Automobile Insurance Company and includes standard forms for Businessowners Coverage and Loss of Income and Extra Expense Coverage, among other things. Upon information and belief, Defendant State Farm Mutual Automobile Insurance Company authorized Defendant State Farm Fire and Casualty Company to issue policies, like the Policy, to customers seeking all risk insurance.

67.    Upon information and belief, Defendants advertised that they would timely pay the true value of covered claims.

68.    The Policy issued to Plaintiff is an "all risk" commercial property policy. The

13

Policy is an all risk policy because its terms indicate that it covers all risk of loss except for risks that are expressly and specifically excluded. In the Policy, Defendants defined Covered Cause of Loss as covering "accidental direct physical loss to Covered Property unless the loss is . . . excluded in Section I . . . or Limited in the Property Subject to Limitations provision."

69.    Plaintiff promptly and dutifully paid substantial premiums to Defendants in exchange for Defendants' promises to provide the insurance coverage set forth in the Policy.

70.    Plaintiff purchased the Policy from Nina Ambrose Insurance Agency, Inc. (the "Agent"), a State Farm insurance agent located in Chesapeake, Virginia. The Policy incorrectly names "Ladies Spa Inc." as the insured, instead of Elegant Massage, LLC d/b/a Light Stream Spa, but correctly identifies Plaintiff's principal place of business located at 665 Newtown Road, Suite 114, Virginia Beach, Virginia 23462, as the premises covered under the Policy. Light Stream Spa is the only business operating at 665 Newtown Road, Suite 114, Virginia Beach, Virginia 23462.

*1.    Business Income Losses and Extra Expenses Are Covered by the Policy.*

71.    The Declarations for the Policy include an endorsement for coverage of "Loss of Income and Extra Expense." The standard form for Loss of Income and Extra Expense Coverage is identified as CMP-4705.1.

72.    Pursuant to this provision, Defendants have promised to pay for the actual loss of business income sustained as a result of the suspension of Plaintiff's and members' of the Classes operations:

> COVERAGES
>
> 2. Loss Of Income
>
> a. We will pay for the actual "Loss Of Income" you sustain due to the necessary "suspension" of your "operations" during the "period of

restoration." The "suspension" must be caused by accidental direct physical loss to property at the described premises. The loss must be caused by a Covered Cause Of Loss …

   3. Extra Expense

   a. We will pay necessary "Extra Expense" you incur during the "period of restoration" that you would not have incurred if there had been no accidental direct physical loss to property at the described premises …

73.    As discussed herein, Plaintiff and members of the Classes suffered an accidental direct physical loss to their property due to the suspension of their business operations caused by the Orders and substantially–similar orders. This physical loss has resulted in substantial lost income and extra expenses for Plaintiff and putative members of the Classes.

74.    The Loss of Income and Extra Expense Endorsement defines "suspension" as:

   a.   The partial slowdown or complete cessation of your business activities; or

   b. That a part or all of the described premises is rendered untenantable, if coverage for "Loss Of Income" applies.

75.    The Loss of Income and Extra Expense Coverage (CMP-4705.1) also includes coverage for losses resulting from an action of Civil Authority:

   4. Civil Authority

   a. When a Covered Cause of Loss causes damage to property other than property at the described premises, we will pay for the actual "Loss of Income" you sustain and necessary "Extra Expense" caused by action of civil authority that prohibits access to the described premises … provided that both of the following apply:

   (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage, and the described premises are within that area; and

   (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause Of Loss that caused the damage, or the action is taken to

15

enable a civil authority to have unimpeded access to the damaged property.

76. Governments throughout the country have issued social distancing, closure and/or stay-at-home orders, which prohibited Plaintiff and other members of the Classes from using their property, thus causing them to suffer direct physical loss of their insured property.

2. *Social Distancing Orders, Closure Orders, and/or Stay-At-Home Orders Are a Covered Cause of Loss and Not Excluded by the Policy*

77. A "Covered Causes of Loss" is defined by the Policy in standard form CMP-4100, as:

We insure for accidental direct physical loss to Covered Property unless the loss is:

4. Excluded in SECTION I – EXCLUSIONS …

78. "Covered Property" is defined by the Policy in standard form CMP–4100, as: "the buildings and structures at the described premises . . . [and] Business Personal Property located in or on the building at the described premises."

79. The exercise of State and local police powers under social distancing, closure and/ or stay-at-home orders, is a Covered Cause of Loss because it caused accidental direct physical loss to the Covered Property.

80. The prohibitions and limitations on the use of Light Stream Spa's property imposed by the Orders caused an accidental direct physical loss to the Covered Property because they prohibited access to, use of, and operations at and by Light Stream Spa, its employees, and customers. As a result of the Orders, Light Stream Spa became unusable, and the Covered Property lost its functionality.

81. There has been a direct physical loss to both the buildings and structures and personal property used in Light Stream Spa's business. The property cannot be used for business

activity in accordance with its pre–Orders function and status. Upon information and belief, every business policyholder in the Classes has likewise suffered substantially similar physical loss.

82.     Plaintiff's and the Classes' "operations" have been "suspended" due to this accidental direct physical loss to Covered Property caused by the Orders.

83.     Because they were an accidental direct physical loss to the Covered Property that resulted in a suspension of Plaintiff's operations, the Orders in and of themselves, constitute a covered cause of loss within the meaning of the Policy. Accordingly, all conditions for "Loss of Income" coverage have been met.

84.     The physical loss caused by the Orders was a natural and continuous sequence unbroken by a new independent cause, which produced the injury, without which such injury would not have occurred. Accordingly, the Orders are the sole cause of the Plaintiff's and putative members' of the Classes loss of business income and extra expenses.

85.     Additionally, the COVID–19 pandemic and the ubiquitous nature of the COVID–19 disease, caused an accidental direct physical loss to Plaintiff's Covered Property because Light Stream Spa lost access to its property in order to stem the spread of this disease. The Orders were issued as a result of physical damage and dangerous physical conditions occurring in properties all around cities and business districts. The Orders were then a continuation of actions being taken in response to accidental physical loss being caused by COVID-19 at all properties open to the public. As a result of direct physical loss stemming from the pandemic, Light Stream Spa's operations were suspended and it lost business income and incurred other covered expenses. Accordingly, this is another basis for demonstrating that all of the conditions for "Loss of Income" coverage have been met.

86.     Further, as an additional basis for coverage under the Policy: (1) COVID-19 caused damage to property other than the Plaintiff's property which resulted in passage of Orders prohibiting Plaintiff's access to its property; and (2) such orders were in response to dangerous physical conditions resulting from the damage to or continuation of a Covered Cause of Loss that caused damage. Prior to the issuance of the Orders, governmental authorities had been limiting access to other properties including restaurants, fitness centers, and theaters. The Orders, which prohibited access to the Covered Property, were thus issued because of accidental direct physical loss to properties other than the Covered Property and because of continuing dangerous conditions at such properties, and are a covered loss under the Policy's Covered Cause of Losses and Civil Authority provisions. Accordingly, all conditions for "Civil Authority" coverage have been met.

87.     Defendants are aware of contractual force majeure clauses that suspend duties to perform in the event of a global pandemic.

88.     Defendants chose not to use force majeure clauses in the Policy or in its insurance policies issued to other members of the Classes and cannot attempt to convert other exclusions into force majeure provisions in order to avoid coverage during a global pandemic.

89.     The Policy includes an Exclusion for "Ordinance Or Law," which is defined as "[t]he enforcement of any ordinance or law … [r]egulating the construction, use or repair of any property [or] requiring the tearing down of any property[.]"

90.     There was no "enforcement of any ordinance or law" "[r]egulating the construction, use or repair" of Plaintiff's property at any relevant time. Social distancing, closure and/or stay-at-home orders do not qualify as an Ordinance or Law excluded under the Policy because they do not regulate zoning or regular physical attributes of the property and are not an

enforcement action. Further, the Orders are not laws or ordinances enacted by the legislative branch of government.

91.    The Policy includes an exclusion for "Acts or Decisions" which is defined as including "the failure to act or decide, of any person, group, organization or governmental body whether intentional, wrongful, negligent or without fault."

92.    Social distancing, closure and stay–at–home orders did not constitute a failure to act or decide by any person, group, organization or governmental body, but rather constituted decisive measures taken by governmental authorities, and as such, the Act or Decisions Exclusion does not apply. The Acts or Decisions Exclusion is also ambiguous and/or incompatible with other policy provisions including Civil Authority coverage, which specifically applies when governmental authorities take certain actions and/or make certain decisions.

93.    The Policy includes an exclusion for "Consequential Losses." The Policy language directly after the "Consequential Losses" provision states: "[d]elay, loss of use or loss of market." The Loss of Income and Extra Expense Endorsement excludes "[a]ny other consequential loss."

94.    Plaintiff does not seek recovery of consequential losses. Plaintiff only seeks to recover losses that were directly caused by direct physical loss to Covered Property. Further, the Loss of Income and Extra Expense Endorsement explicitly promises to pay for "Loss Of Income" which Plaintiff seeks to recover.

95.    The Consequential Losses exclusion is ambiguous and should be construed against Defendants. To the extent that this exclusion prohibits claims for losses to property, loss of use, or lost income, it is incompatible with other language in the Policy and the Loss of Income and Extra Expense Endorsement. The Policy explicitly covers direct physical loss. The

Loss of Income and Extra Expenses Endorsement specifically provides for recovery of "Loss Of Income" and Civil Authority coverage is triggered when the action of a civil authority "prohibits access to the described premises." Accordingly, the Policy and Endorsement contemplate coverage when the insured loses income and/or loses use of property.

96.     The Policy also includes an Exclusion for "Fungi, Virus or Bacteria," which excludes coverage of losses from:

   **(1)** Growth, proliferation, spread or presence of "fungi" or wet or dry rot; or

   **(2)** Virus, bacteria or other microorganism that induces or is capable    of inducing physical distress, illness or disease; and

   **(3)** We will also not pay for:

   **(a)** Any loss of use or delay in rebuilding, repairing or replacing covered property, including any associated cost or expense, due to interference at the described premises or location of the rebuilding, repair or replacement of that property, by "fungi", wet or dry rot, virus, bacteria or other microorganism;

   **(b)** Any remediation of "fungi", wet or dry rot, virus, bacteria or other microorganism, including the cost or expense to:

   **i.** Remove the "fungi", wet or dry rot, virus, bacteria or other microorganism from Covered Property or to repair, restore or replace that property;

   **ii.** Tear out and replace any part of the building or other property as needed to gain access to the "fungi", wet or dry rot, virus, bacteria or other microorganism; or

   **iii.** Contain, treat, detoxify, neutralize or dispose of or in any way respond to or assess the effects of the "fungi", wet or dry rot, virus, bacteria or other microorganism; or

   **(c)** The cost of any testing or monitoring of air or property to confirm the type, absence, presence or level of "fungi", wet or dry rot, virus, bacteria or other microorganism, whether performed prior to, during or after removal, repair, restoration or replacement of Covered Property.

97.     The Virus Exclusion does not preclude coverage for Plaintiff's claim under the Policy. The Virus Exclusion only excludes losses resulting from the "growth, proliferation,

spread or presence" of a "[v]irus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness or disease." There was no "growth, proliferation, spread, or presence" of a "[v]irus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness, or disease" on Plaintiff's property at any relevant time.

98.     Plaintiff does not claim that there has been COVID–19 on its premises and Plaintiff's loss here was not caused by the presence of SARS-CoV-2, or an outbreak of the COVID-19 disease, on its premises. Rather, Plaintiff's loss results directly from social distancing, closure and/or stay-at-home orders, which have forced Plaintiff to suspend its operations and/or have limited the ability of customers to visit Plaintiff's business to pay for services. The Orders themselves caused a direct physical loss to Plaintiff's Covered Property and therefore the Virus Exclusion simply does not apply.

99.     The Virus Exclusion should be construed in favor of Plaintiff and members of the Classes and against Defendants.

100.    Further, Defendants should be estopped from enforcing the Virus Exclusion, on principles of regulatory estoppel, as well as general public policy.

101.    In 2006, two insurance industry trade groups, Insurance Services Office, Inc. ("ISO") and the American Association of Insurance Services ("AAIS"), represented hundreds of insurers in a national effort to seek approval from state insurance regulators for the adoption of the Virus Exclusion.[7]  When adding the exclusion to the standard commercial property policy form, ISO and AAIS, misrepresented to insurance regulators what the exclusion was for, mispresented that it would not narrow coverage, and misrepresented the apparent purpose of the

---

[7] In addition to Form CP 01 40 07 06, which was submitted for approval in most states, the insurance industry also sought approval for Form CP 01 75 07 06 in Alaska, District of Columbia, Louisiana, New York, and Puerto Rico, which contained slightly different language related to a mold exclusions that was previously adopted in other states.

exclusion.

102.    In their filings with the various state regulators, on behalf of the insurers, ISO and AAIS represented that the adoption of the Virus Exclusion was only meant to "clarify" that coverage for "disease–causing agents" has never been in effect, and was never intended to be included, in the property policies. Further, these filings indicated that the reason for the amendment was for contamination removal costs.

103.    Specifically, in its "ISO Circular" dated July 6, 2006 and entitled "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," ISO represented to the state regulatory bodies that:

> While property polices have not been a source of recovery for losses involving contamination by disease–causing agents, the specter of pandemic hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies, may face claims in which there are efforts to expand coverage to create sources of recovery for such losses, contrary to policy intent.
>
> In light of these concerns, we are presenting an exclusion *related to contamination* by disease–causing viruses or bacteria or other disease–causing microorganisms. (emphasis added).

104.    Similarly, as reported[8], AAIS, in its "Filing Memorandum" in support of the Virus Exclusions represented:

> Property policies have not been, nor were they intended to be, a source of recovery for loss, cost or expense caused by disease-causing agents. With the possibility of a pandemic, there is concern that claims may result in efforts to expand coverage to create recovery for loss where no coverage was originally intended . . . This endorsement clarifies that loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded . . .

---

[8] Richard P. Lewis, John N. Ellison and Luke E. Debevec, *Here we go again: Virus exclusion for COVID-19 and insurers*, NU Property Casualty, (Apr. 07, 2020, 12:00 AM), https://www.propertycasualty360.com/2020/04/07/here-we-go-again-virus-exclusion-for-covid-19-and-insurers/.

105.     In light of these representations, and in reliance on them, the Virus Exclusion was added to the standard–form exclusions, to provide that this type of clean–up was excluded.

106.     The foregoing representations made by the insurance industry were false and/or misleading. By 2006, the time of the state applications to approve the Virus Exclusion, courts had repeatedly found that property insurance policies covered claims involving disease–causing agents, and had held on numerous occasions that any condition making it impossible to use property for its intended use constituted physical loss to property.

107.     The foregoing assertions by the insurance industry, made to obtain regulatory approval of the Virus Exclusion, were in fact misrepresentations and for this reason, among other public policy concerns, insurers should now be estopped from enforcing the Virus Exclusion to avoid coverage of claims.

108.     In securing approval for the adoption of the Virus Exclusion by mispresenting to state regulators that the Virus Exclusion would not change the scope of coverage, the insurance industry effectively narrowed the scope of the insuring agreement without a commensurate reduction in premiums charged. Under the doctrine of regulatory estoppel, the Court should not permit the insurance industry to benefit from this type of duplicitous conduct before state regulators.

109.     Moreover, Plaintiff's claim occurred in the absence of virus contamination. The claim at issue is not for clean–up. Nothing in the Orders compels the Plaintiff or any policyholder to de–contaminate their premises. Nothing in the Orders suggests that the reason for their issuance was to prevent the premises from viral contamination. Defendants' denial of coverage is contrary to the plain language of the Policy, and to Defendants' corresponding promises and contractual obligations, and to the insurance industry's representation, as stated in

the ISO Circular, that the exclusion is related to contamination.

110.     The most plausible interpretation of the Virus Exclusion language is that, as the insurance industry told insurance regulators in 2006, it only applies to contamination. The exclusion may apply in the event of a loss not pleaded in this litigation–a claim for losses sustained from virus contamination. Only with that interpretation can Plaintiff's reasonable expectation of what it purchased be harmonized with the Policy's language.

**E.     State Farm Denies Plaintiff's Claim**

111.     On March 16, 2020, Plaintiff submitted a timely claim for loss of business income and extra expenses under the Policy, as a result of the Orders.

112.     On March 26, 2020, Defendants denied Plaintiff's claim (the "Denial Letter"). A copy of the Denial Letter is attached hereto as Exhibit B.

113.     In the Denial Letter, Defendants stated:

> It was explained that you voluntarily closed your business on March 16, as a result of Federal recommendations for social distancing due to Covid-19. The impact of the recommendations was reflected in the lack of customers visiting your business beginning a couple days before you elected to close on March 16, 2020. There was no civil order to close your business at the time of our telephone conversation. It was further noted that there is no known damage to your business space or property resulting from Covid-19.
>
> We have completed our evaluation of your claim. In order for your Loss of Income Coverage to apply, the suspension of your business has to be caused by a Covered Cause of Loss outlined in your policy. Unfortunately, your policy specifically excludes coverage for loss caused by virus. Therefore, coverage is not extended for your loss.

114.     The Denial Letter attempts to penalize Plaintiff for ceasing its operations consistent with federal social distancing guidance and in order to protect its employees and the public from the transmission of COVID-19. The Denial Letter further ignores that the continued closure of Plaintiff's business was mandated by Governor Northam's orders.

115.     Upon Defendants' denial of coverage, Plaintiff requested a copy of its "all risk"

commercial property insurance policy from the Agent and Defendants' Claim Specialist. Plaintiff was provided with a copy of the Policy attached as Exhibit A.

116.    In support of its denial of coverage, Defendants generally cited the above–referenced Exclusions.

117.    None of the cited provisions exclude losses resulting from social distancing, closure and/or stay–at–home orders, and as such, these Orders are a Covered Cause of Loss under the Policy, an "all risk" commercial property insurance policy.

118.    Defendants denied Light Stream Spa's claim without any inspection, or review of Light Stream Spa's physical location or documents concerning its business activities in 2020 and made a summary denial of Light Stream Spa's claim without undertaking any individualized investigation.

119.    Defendants have thereby waived any right to inspect such premises, deny coverage for any reason related to conditions at such location, or raise any defense related to conditions at such location or facts specific to Light Stream Spa.

120.    The lack of diligence in the denial of Light Stream Spa's claim, and their lack of consideration given to the specific details of the claim, indicate that the Defendants did not engage in a good faith or reasonable investigation of the claim, which included assessment of facts or issues relevant to Light Stream Spa.

121.    Defendants' denial of coverage is perfunctory, inadequate, and contradictory. Light Stream Spa does not claim that there has been COVID–19 on its premises. Nevertheless, Defendants claim that a Virus Exclusion operates to deny the claim and claims of other Virginia and nationwide policyholders.

122.    Defendants accepted the premiums paid by Light Stream Spa, but failed to

provide coverage for lost business income, extra expense, civil authority, or other applicable coverage for claims like those submitted by Light Stream Spa and the proposed members of the Classes, which were wrongfully denied by Defendants.

123.    Defendants' rejection of Light Stream Spa's and members' of the Classes claims was part of a uniform scheme by Defendants to limit their losses during the COVID–19 pandemic, notwithstanding that the Policy and substantially identical policies provide coverage for losses due to accidental direct physical loss to property and from closure orders issued by civil authorities, among other coverage.

124.    Although insurers like Defendants are trying to minimize their exposure, the insurance industry, "has some $18.4 billion in net reserves for future payouts, according to the most recent data from A.M. Best Co."[9]

125.    Upon information and belief, Defendants collected more than $64.8 billion in insurance premiums in 2019 alone. Notwithstanding this, on information and belief, Defendants are categorically denying claims brought by businesses ordered to close because of the social distancing, closure and/or stay–at–home orders, including those brought by Plaintiff and the proposed Classes. This deliberate strategy and uniform conduct suggests strongly that Defendants' true goal is minimizing payments by any means necessary.

126.    Defendants' wrongful denial of Light Stream Spa's claim was not an isolated incident. Rather, upon information and belief, Defendants have similarly denied coverage nationwide for lost income and extra expenses as a result of social distancing, closure and/or stay-at-home orders. Accordingly, Defendants have engaged in the same misconduct alleged

---

[9] Leslie Scism, *U.S. Businesses Gear Up for Legal Disputes With Insurers Over Coronavirus Claims*, Wall Street J. (Mar. 6, 2020, 10:00 AM), https://www.wsj.com/articles/u-s-businesses-gear-up-for-legal-disputes-with-insurers-over-coronavirus-claims-11583465668.

herein with respect to Light Stream Spa, in connection with claims submitted by numerous other insureds, including members of the Classes who have suffered losses arising from social distancing, closure and/or stay–at–home orders issued throughout the country and had their claims categorically denied by Defendants.

127.    Light Stream Spa's claims and those of the proposed Classes all arise from a single course of conduct by the Defendants–their systemic and blanket refusal to provide any coverage for business losses and extra expenses.

128.    Defendants' wrongful conduct alleged herein has caused significant damage, and if left unchecked will continue to cause significant damage, to Light Stream Spa and other members of the proposed Classes.

129.    Defendants categorical treatment, failure to investigate in good faith, and denial of Light Stream Spa's and the members' of the Classes claims appears to be part of a broader strategy being employed by the insurance industry generally, to broadly deny claims for business interruption coverage related to social distancing, closure and/or stay–at–home orders, and has resulted in numerous lawsuits brought by businesses against property insurance companies throughout the country.

130.    Defendants' denial of lost business income and extra expense claims has left Plaintiff and members of the Classes without vital coverage to ensure the survival of their businesses during this temporary suspension of operations. This blanket denial of claims is guided not by policy interpretation or insurers' earlier representations to regulators, but by the sheer size of the exposure to Defendants. Defendants offered business interruption insurance to their policyholders to insure "all risks" including the risks insureds are now facing. Losses stemming from risks insured by Defendants should not be borne by policyholders who faithfully

paid premiums and timely submitted valid claims.

## V.    CLASS ACTION ALLEGATIONS

131.    Plaintiff brings this proposed action pursuant to Fed. R. Civ. P. 23(b)(1), 23(b)(2)

and 23(b)(3) on behalf of themselves and all members of the proposed Classes (or any other class

authorized by the Court) defined as follows:

> **Nationwide Class**: All persons or entities in the United States that purchased Loss of
> Income and Extra Expense Coverage from Defendants, with the same or substantially
> identical terms, and submitted claims for business income losses and/or extra expenses
> incurred as a result of social distancing, closure and/or stay-at-home orders issued from
> March 2020 forward, which were denied by Defendants (the "Nationwide Class" or
> "Class").

> **Virginia Class:** All persons or entities in the Commonwealth of Virginia that purchased
> Loss of Income and Extra Expense Coverage from Defendants, with the same or
> substantially similar terms, and submitted claims for business income losses and/or extra
> expenses incurred as a result of social distancing, closure and/or stay-at-home orders
> issued from March 2020 forward, which were denied by Defendants (the "Virginia Sub-
> Class").

> **Declaratory Judgment Class**: All persons or entities in the United States that
> purchased insurance policies from Defendants including Loss of Income and Extra
> Expense Coverage and including a Virus Exclusion, with the same or substantially
> identical terms (the "Declaratory Judgment Class").

132.    The Class, Declaratory Judgment Class and Virginia Sub-Class are referred to

herein as the "Classes." Excluded from the Classes are Defendants and their parents, subsidiaries

and corporate affiliates, officers, directors, employees, assigns, and successors, the court, court

staff, Defendants' counsel and all respective immediate family members of the excluded entities

described above.

133.    Plaintiff reserves the right to revise the definition of the Class, Declaratory

Judgment Class and Virginia Sub-Class based upon subsequently discovered information and

reserves the right to establish additional sub-classes where appropriate.

134.    The members of the Classes are so numerous that joinder of all members is impracticable. Plaintiff believes that thousands of persons or entities geographically dispersed throughout the United States and Virginia have been damaged by Defendants' misconduct, alleged herein. The names and addresses of the members of the Classes are readily identifiable through documents maintained by Defendants. Members of the Classes may be notified of the pendency of this action by published, mailed, and/or electronic notice.

135.    Plaintiff's claims are typical of the claims of all members of the Classes, as all members of the Classes are similarly affected by Defendants' wrongful conduct and their claims are based on such conduct. Further, Plaintiff's claims are typical of all claims of all members of the Classes because its claims arise from the same underlying facts and are based on the same factual and legal theories as the claims of all members of the Classes.

136.    Plaintiff and its counsel will fairly and adequately protect the interests of the Classes. Plaintiff's interests do not conflict with the interests of the Classes it seeks to represent. Plaintiff has retained counsel competent and experienced in class and complex litigation. Plaintiff and its counsel have vigorously prosecuted, and will continue to vigorously prosecute, this action.

137.    Class certification is warranted because common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes. The questions of law and fact common to the Classes include, without limitation:

      a.  Whether Plaintiff and members of the Nationwide Class and/or Virginia Sub-Class suffered a covered loss under the policies issued to members of the Classes;

      b.  Whether Defendants' Loss of Income and Extra Expense coverage applies to the

suspension of business caused by the social distancing, closure and/or stay–at–home orders issued throughout the country;

c. Whether Defendants' Civil Authority coverage applies to the prohibition on access caused by the social distancing, closure and/or stay–at–home orders issued throughout the country;

d. Whether, through the acts and conduct alleged above, Defendants violated their express or implied obligations to members of the Nationwide Class and/or Virginia Sub-Class;

e. Whether Defendants breached their contracts of insurance through a uniform and blanket denial of all claims for business losses and/or extra expenses;

f. Whether Defendants are barred from raising the Virus Exclusion in light of the claims and their prior misrepresentations regarding the exclusion;

g. Whether the Virus Exclusion is inapplicable under the policies at issue, void, against applicable law and/or in violation of public policy;

h. Whether Defendants breached their implied covenant of good faith and fair dealing to Plaintiff and members of the Virginia Sub-Class; and

i. Whether members of the Classes have been damaged by the wrongs alleged herein.

138. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Even if individual members of the Classes had the resources to pursue individual litigation, it would be unduly burdensome on the courts in which the individual litigation would proceed. Individual litigation

magnifies the delay and expense to all parties in the court system of resolving the controversies engendered by Defendants' common course of conduct. The class action device allows a single court to provide the benefits of unitary adjudication, judicial economy, and the fair and equitable handling of all members' of the Classes claims in a single forum. The conduct of the action as a class action conserves resources of the parties and of the judicial system, and protects the rights of the members of the Classes. Furthermore, for many, if not most members of the Classes, a class action is the only feasible mechanism that allows them an opportunity for legal redress and justice.

139.    The interest of members within the Classes in individually controlling the prosecution of separate actions is theoretical and not practical. The Classes have a high degree of similarity and are cohesive, and Plaintiff anticipates no difficulty in the management of this matter as a class action.

140.    The Classes may be certified under Fed. R. Civ. P. 23(b)(1)(A) and (B) because the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant, would be dispositive of the interests of nonparties to the individual adjudications, and would substantially impair the ability of such nonparties to protect their interests.

141.    The Classes may also be certified under Fed. R. Civ. P. 23(b)(2) because Defendants have acted on grounds generally applicable to the Classes, thereby making it appropriate to award declaratory relief with respect to the Classes.

142.    Further questions of law and fact common to members of the Classes predominate over any questions affecting any individual members and a class action is superior to other

available methods for the fair and efficient adjudication of the controversy as recognized by Fed.

R. Civ. P. 23(b)(3).

## VI.    CLAIMS FOR RELIEF

### COUNT I
### DECLARATORY JUDGMENT
**(On behalf of Plaintiff and the Declaratory Judgment Class)**

143.    Plaintiff incorporates by reference, as if fully set forth herein, the facts set forth in
the above paragraphs.

144.    Plaintiff brings this count on behalf of itself and the Declaratory Judgment Class.

145.    An actual case or controversy exists regarding the rights of Plaintiff and members
of the Declaratory Judgment Class and Defendants' obligations under the Policy.

146.    It is necessary to resolve Plaintiff's rights and Defendants' obligations under the
Policy and to determine whether the Virus Exclusion is inapplicable, unenforceable and/or void.

147.    There is no definition of Virus in the Policy.

148.    The Virus Exclusion should be construed in favor of Plaintiffs and members of
the Declaratory Judgment Class and against Defendants.

149.    Defendants are barred from raising the Virus Exclusion in light of their prior
misrepresentations regarding the exclusion.

150.    The Virus Exclusion is inapplicable to Plaintiff's and members' of the
Declaratory Judgment Class' claims and/or is void and unenforceable as against applicable law
and in violation of public policy.

151.    The Virus Exclusion does not preclude coverage for Plaintiff's claim under the
Policy or the claims of the Declaratory Judgment Class under substantially identical policies.

152.    The Virus Exclusion only excludes losses resulting from the "growth,
proliferation, spread or presence" of a "[v]irus, bacteria or other microorganism that induces or is

capable of inducing physical distress, illness or disease."

153.   There was no "growth, proliferation, spread or presence" of a "[v]irus, bacteria or other microorganism that induces or is capable of inducing physical distress, illness or disease" on Plaintiff's property at any relevant time.

154.   Plaintiff does not claim that there has been COVID–19 on its premises and Plaintiff's loss here was not caused by the presence of SARS-CoV-2, or an outbreak of the COVID-19 disease, on its premises.

155.   Defendants are also barred by the doctrine of regulatory estoppel from enforcing the Virus Exclusion because, in securing approval for the adoption of the Virus Exclusion, Defendants misrepresented to state regulators that the exclusion would not change the scope of coverage, and effectively narrowed the scope of business insurance coverage agreements without a commensurate reduction in premiums charged.

156.   In filings with the various state regulators, the insurance industry represented that the adoption of the Virus Exclusion was only meant to "clarify" that coverage for "disease–causing agents" has never been in effect, and was never intended to be included, in the property policies.

157.   These assertions by the insurance industry were made to obtain approval of the Virus Exclusion, but were in fact, misrepresentations.  For this reason, among other public policy concerns, insurers should now be estopped from enforcing the Virus Exclusion to avoid coverage of claims resulting from social distancing, closure and/or stay-at-home orders.

158.   Under the doctrine of regulatory estoppel, Defendants should not be permitted to benefit from this type of duplicitous conduct before state regulators.

159.   Pursuant to 28 U.S.C. § 2201, Plaintiff and members of the Declaratory Judgment

Class seek a declaratory judgment from this Court declaring that the Virus Exclusion in the Policy and substantially identical policies is inapplicable to claims for loss of income and extra expenses resulting from social distancing, closure and/or stay-at-home orders issued from March 2020 forward and/or unenforceable or void.

**COUNT II**
**BREACH OF CONTRACT**
**(On behalf of Plaintiff and the Nationwide Class, or alternatively, on behalf of the Virginia Sub-Class)**

160. Plaintiff incorporates by reference, as if fully set forth herein, the facts set forth in the above paragraphs.

161. Plaintiff brings this cause of action on behalf of itself and the Nationwide Class, or alternatively, on behalf of the Virginia Sub-Class.

162. At all times relevant herein, Plaintiff and members of the Nationwide Class and Virginia Sub-Class have paid premiums and fulfilled or performed all obligations they have to Defendants, including those under all relevant insurance policies described in this complaint.

163. The Policy and substantially identical policies are insurance contracts under which Defendants were paid premiums in exchange for their promise to pay the losses of Plaintiff and members of the Nationwide Class and Virginia Sub-Class for claims covered by the Policy and substantially identical policies, such as business income losses and extra expenses incurred as a result of social distancing, closure and/or stay-at-home orders.

164. Plaintiff and members of the Nationwide Class and Virginia Sub-Class provided Defendants with timely notice of their claims.

165. Plaintiff and members of the Nationwide Class and Virginia Sub-Class have complied with all applicable provisions of the Policy and substantially identical policies, including payment of the premiums in exchange for coverage under the Policy and substantially

34

identical policies, and yet Defendants have abrogated their insurance coverage obligations pursuant to the clear and unambiguous terms of the Policy and substantially identical policies.

166.    Plaintiff's and the members' of the Nationwide Class and Virginia Sub-Class Loss of Income Coverage is triggered because (a) Plaintiff and the members of the Nationwide Class and Virginia Sub-Class have sustained actual loss of business income due to the closures of their businesses and/or social distancing orders, (b) said closures constitute a necessary suspension of their operations under their insurance policies, (c) this suspension has resulted from physical loss to property at the described premises due to the social distancing and/or stay-at-home orders, (d) this physical loss to the property is a Covered Cause of Loss, (e) no coverage exclusions or limitations apply to exclude or limit coverage, and (f) some or all of the periods of Plaintiff's and members' of the Nationwide Class and Virginia Sub-Class closures are within the period of restoration under their insurance policies.

167.    Plaintiff's and the members' of the Nationwide Class and Virginia Sub-Class Extra Expense Coverage is triggered because (a) Plaintiff and the members of the Nationwide Class and Virginia Sub-Class have incurred extra expenses, (b) said extra expenses would not have been incurred absent the direct physical loss to property at the described premises caused by social distancing, closure and/or stay-at-home orders, and (c) this direct physical loss is a Covered Cause of Loss.

168.    With respect to Plaintiff's and members' of the Nationwide Class and Virginia Sub-Class Civil Authority coverage, the social distancing, closure and/or stay-at-home orders trigger that coverage because (a) they are orders of a civil authority, (b) the orders specifically prohibit operations at and access to the covered property, (c) such prohibition was continuous after the orders were issued, (d) the orders prohibit access as the direct result of damage to

property, other than at the premises in question, caused by or resulting from a Covered Cause of Loss, (e) no coverage exclusions or limitations apply to exclude or limit coverage, (f) Plaintiff and the members of the Nationwide Class and Virginia Sub-Class have suffered actual and covered loss of income and extra expenses, and (g) coverage should begin as of a date to be determined at trial.

169.    Plaintiff and members of the Nationwide Class and Virginia Sub-Class suffered a covered loss and no exclusions apply.

170.    By denying coverage for any business income losses and extra expenses incurred by Plaintiff and members of the Nationwide Class and Virginia Sub-Class as a result of social distancing, closure and/or stay-at-home orders, Defendants have breached their coverage obligations under the Policy and substantially identical policies.

171.    As a result of Defendants' breach of the Policy and substantially identical policies, Plaintiff and members of the Nationwide Class and Virginia Sub-Class have sustained substantial damages for which Defendants are liable. Plaintiff and the members of the Nationwide Class and Virginia Sub-Class have been damaged in the amount of coverage to which they are entitled under their insurance policies, the premiums they paid, and in an amount to be established at trial. Plaintiff seeks compensatory damages with interest thereon for itself and members of the Nationwide Class and Virginia Sub-Class.

172.    Plaintiff and members of the Nationwide Class and Virginia Sub-Class were unable to mitigate their lost income or extra expenses because their businesses were generated through in–person services and they could not shift to alternative business models because of how their businesses operate, and other practical considerations.

## COUNT III
## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (On behalf of Plaintiff and the Virginia Sub-Class)

173.     Plaintiff incorporates by reference, as if fully set forth herein, the facts set forth in the above paragraphs.

174.     Plaintiff brings this cause of action on behalf of itself and the Virginia Sub-Class.

175.     When Defendants issued insurance policies to Plaintiff and members of the Virginia Sub-Class, an implied covenant of good faith and fair dealing arose.  Defendants' duty of good faith and fair dealing obligated Defendants to consider Plaintiff's and members of the Virginia Sub-Class' interests at least equal to their own interests, to fully advise Plaintiff and members of the Virginia Sub-Class of all of their rights under the Policy and substantially identical policies and under the law with regards to claims arising under the insurance policies, to acknowledge and act reasonably promptly with respect to claims arising under the insurance policies, to adopt and implement a reasonable standard for the prompt investigation and processing of claims under the insurance policies, to promptly affirm or deny coverage of claims within a reasonable period of time after presentation of claims, and to avoid withholding or delating payment of any benefits owed under the insurance policies.

176.     By their conduct alleged herein, Defendants breached the implied covenant of good faith and fair dealing arising out of their agreements with Plaintiff and the Virginia Sub-Class by, among other things, engaging in the following: (a) knowingly and intentionally failing to promptly and thoroughly investigate all possible bases to support Plaintiff's and the members of the Virginia Sub-Class' claims for coverage, including a complete failure to demonstrate that Defendants read or considered the actual language of the Policy and substantially identical policies and denying coverage before any investigation; (b) intentionally placing Defendants'

interest in limiting risk ahead of its insureds' interests in obtaining benefits to which they are rightfully entitled under the insurance policies; (c) misrepresenting the terms of coverage by submitting misleading statements to regulators about the effect of the Virus Exclusion and failing to give the Virus Exclusion the meaning attributed to the exclusion when presented to regulators for approval; and (d) wrongfully denying Plaintiff's and the members of the Virginia Sub-Class' claims and thereby forcing Plaintiffs to hire attorneys in order to obtain coverage to which Plaintiff and members of the Virginia Sub-Class are entitled.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and all others similarly situated, respectfully request that this Court enter judgment against Defendants and in favor of Plaintiff and the Classes, and award the following relief:

A.    An order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiff as the representative of the Classes, and Plaintiff's counsel as counsel for the Classes;

B.    An order declaring that the Virus Exclusion in the Policy and substantially identical policies is inapplicable to claims for loss of income and extra expenses resulting from social distancing, closure and/or stay-at-home orders issued from March 2020 forward and/or unenforceable or void.

C.    An order declaring that that Defendants have breached their contractual obligations to Plaintiff and members of the Nationwide Class and Virginia Sub-Class;

D.    An order declaring that Defendants have breached their implied covenant of good faith and fair dealing to Plaintiff and members of the Virginia Sub-Class

under the Policy and substantially identical policies;

E.      An order awarding actual damages to Plaintiff and members of the Classes to

fully compensate them for losses sustained as a direct, proximate, and/or

producing cause of Defendants' breaches and unlawful conduct;

F.      An order requiring Defendants to pay both pre- and post-judgment interest on

any amounts awarded;

G.      An award of costs, expenses and attorneys' fees pursuant to Virginia Code §

38.2–209 and as otherwise permitted by law; and

H.      Such other or further relief as the Court may deem appropriate, just, and

equitable.

## VIII.    DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of

any and all issues in this action so triable of right.

DATED: July 21, 2020                    Respectfully submitted,

                                        /s/ William H. Monroe, Jr.
                                        William H. Monroe, Jr. (VSB No. 27441)
                                        Marc C. Greco (VSB No. 41496)
                                        Kip A. Harbison (VSB No. 38648)
                                        Michael A. Glasser (VSB No. 17651)
                                        **GLASSER AND GLASSER, P.L.C.**
                                        580 East Main Street, Suite 600
                                        Norfolk, VA 23510
                                        Telephone: (757) 625-6787
                                        Facsimile: (757) 625-5959
                                        bill@glasserlaw.com
                                        marcg@glasserlaw.com
                                        kip@glasserlaw.com
                                        michael@glasserlaw.com

                                        Joseph H. Meltzer
                                        Melissa L. Troutner

Natalie Lesser
Jordan Jacobson
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
jmeltzer@ktmc.com
mtroutner@ktmc.com
nlesser@ktmc.com
jjacobson@ktmc.com

James E. Cecchi
Lindsey H. Taylor
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO,**
**P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973)-994-1700
Facsimile:  (973)-994-1744
jcecchi@carellabyrne.com
ltaylor@carellabyrne.com

*Attorneys for Plaintiff and the proposed Classes*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 21, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record who have made a formal appearance

Dated:  July 21, 2020

_/s/ William H. Monroe, Jr._
William H. Monroe, Jr. (VSB No. 27441)