

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

ELEGANT MASSAGE, LLC d/b/a LIGHT
STREAM SPA, on behalf of itself and all
others similarly situated,

      **Plaintiff,**

    **v.**                              **CIVIL ACTION NO. 2:20-cv-265**

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY and STATE
FARM FIRE AND CASUALTY
COMPANY,

      **Defendants.**

### *MEMORANDUM OPINION AND ORDER*

Before the Court are three motions ripe for judicial determination. The first is a Motion for Class Certification under Rule 23(b)(3), Appointment of Class Representative, and Appointment of Class Counsel filed by Elegant Massage, LLC d/b/a Light Stream Spa ("Elegant Massage" or "Plaintiff"). Pl.'s Second Mot. Class Cert., Appoint. Class Rep. & Appoint. Class Counsel, ECF No. 237 ("Second Mot. Class Cert."). The second is a Motion to Exclude the Testimony and Opinions of Jeffrey E. Meyers filed by State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company (collectively, "State Farm" or "Defendants"). Defs.' Mot. Exclude Test. & Op. of Jeffrey E. Meyers, ECF No. 253 ("Defs.' Mot. Exclude"). The third is a Motion to Exclude Opinions and Testimony of Stephen D. Prowse for Class Certification, Summary Judgment, and Trial filed by Elegant Massage. Pl.'s Mot. Exclude Op. & Test. of Stephen D. Prowse for Class Cert., Summ. J., and Trial, ECF No. 278 ("Pl.'s Mot. Exclude").

Upon review of the relevant filings, the Court finds that hearings on Plaintiff's Motions

1

and Defendants' Motion are not necessary. *See* E.D. VA. LOCAL CIV. R. 7(J). For the reasons stated herein, Defendants' Motion to Exclude is **DENIED**, Plaintiff's Motion to Exclude is **GRANTED IN PART**, and Plaintiff's Motion for Class Certification is **GRANTED**.

## I.   FACTUAL AND PROCEDURAL HISTORY

On May 27, 2020, Plaintiff filed the instant suit. *See* Compl., ECF No. 1. On July 21, 2020, Plaintiff filed an amended complaint. *See* Am. Compl., ECF No. 20. In its Amended Complaint, Plaintiff alleges that Elegant Massage has owned and operated Light Stream Spa since 2016, which provides therapeutic massages in Virginia Beach, Virginia. *Id.* at ¶¶ 2, 57. In 2019, Plaintiff purchased an insurance policy (Policy No. 96-C6-P556-2) ("the Policy") from State Farm. *Id.* at ¶ 3, Ex. A, at 4. The Policy issued to Plaintiff is an "all risk" commercial property insurance policy, which covers loss or damage to the covered premises resulting from all risks other than those expressly excluded. *Id.* at ¶¶ 1, 3, 25-27. The Policy was effective from July 22, 2019 until July 22, 2020 and Plaintiff paid an annual premium of $475.00. *Id.* at Ex. A, at 4. The Policy includes coverage for "Loss of Income and Extra Expense," the standard form for which is identified as CMP-4705.1. *Id.* at ¶ 3, Ex. A, at 7-8, 17. Under the provision, the Policy provides for the loss of business income sustained as a result of the suspension of business operations which includes action of a civil authority that prohibits access to the Plaintiff's business property. *Id.* at ¶¶ 3, 34-35, Ex. A, at 17-20. The Policy also states that it does not cover Exclusions for "Fungi, Virus or Bacteria," "Ordinance or Law," "Acts or Decisions," or "Consequential Loss" *Id.* at ¶¶ 89, 91, 93, 96.

On March 13, 2020, President Donald J. Trump issued a National Emergency Concerning the Novel Coronavirus Disease ("COVID-19) Outbreak.[1] On March 16, 2020, the Centers for

---

[1] Proclamation No. 9994, 85 Fed. Reg. 15337 (March 18, 2020). "Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak." ("Presidential COVID-19 Proclamation").

Disease Control and Prevention (CDC) issued guidance recommending the implementation of "social distancing" policies to prevent the spread of the a novel strain of coronavirus, SARS-CoV-2 ("COVID-19"). On March 20, 2020, Governor Northam and the Virginia State Health Commissioner declared a public health emergency and restricted the number of patrons permitted in restaurants, fitness centers, and theaters to ten or less.[2] On March 23, 2020, Governor Northam issued Executive Order No. 53, which ordered the closure of "recreational and entertainment businesses," including "spas" and "massage parlors."[3] On March 23, 2020, Governor Northam issued Executive Order No. 55, which ordered all individuals in Virginia to stay home unless they were carrying out necessary life functions.[4] On May 8, 2020, the Governor issued Executive Order No. 61, which amended Executive Order Nos. 53 and 55 and, beginning on May 15, 2020, eased some of the restrictions.[5] Under Executive Order No. 61, spas and message centers were permitted to re-open subject to certain restrictions including limiting occupancy to 50% as well as requiring six feet between workstations, workers and patrons to wear face coverings, and hourly cleaning and disinfection while in operation. *Id.* However, if businesses were unable to comply with the restrictions in Executive Order No. 61, they were ordered to remain closed. *Id.*

As a result of the policies on social distancing and restrictions on its business, Plaintiff voluntarily closed Light Stream Spa on March 16, 2020. Am. Compl. at ¶ 58. On March 23, 2020, Executive Order No. 53 mandated that Plaintiff remain closed through May 15, 2020. *Id.* Accordingly, Plaintiff suffered a complete loss of income after closing on March 16, 2020 and incurred extra expenses as well. *Id.* at ¶¶ 63-64. On March 16, 2020, Plaintiff submitted a claim

---

2 Order of Public Health Emergency One, "Amended Order of the Governor and State Health Commissioner Declaration of Public Health Emergency," (March 20, 2020).
3 Va. Exec. Order No. 53 (2020).
4 Va. Exec. Order No. 55 (2020).
5 Va. Exec. Order No. 61 (2020).

for loss of business income and extra expenses under the Policy. *Id.* at ¶ 111. On March 26, 2020, Defendants denied Plaintiff's claim ("Denial Letter"). *Id.* at ¶ 112. The Denial Letter stated that the grounds for denial were because Plaintiff voluntarily closed their business on March 16, 2020, there was no civil order to close the business, there was no known damage to the business space or property resulting from COVID-19, and the Loss of Income Coverage excludes coverage for loss caused by virus. *Id.* at ¶ 113.

On May 27, 2020, Plaintiff filed a Class Action Complaint for Declaratory Judgement (Count I) and Breach of Contract (Count II) against Defendants, pursuant to Federal Rule of Civil Procedure (FRCP) 23(b)(1), 23(b)(2), and 23(b)(3) on behalf of itself and all members of the proposed class and sub-class. Compl. at ¶¶ 48-77. On July 21, 2020, Plaintiff filed the instant First Amended Class Action Complaint against Defendants pursuant to FRCP 23(b)(1), 23(b)(2), and 23(b)(3) for Declaratory Judgment on behalf of itself and the proposed Declaratory Judgment Class (Count I), Breach of Contract on behalf of itself and the proposed Nationwide Class, or alternatively, on behalf of the proposed Virginia Sub-Class (Count II), and Breach of Covenant of Good Faith and Fair Dealing on behalf of itself and the proposed Virginia Sub-Class (Count III). Am. Compl. at ¶¶ 143-176. On August 11, 2020, Defendants filed a Motion to Dismiss for Failure to State a Claim as to all three Counts. Defs.' Mot. Dismiss Pl.'s Am. Compl., ECF No. 29. Plaintiff responded in opposition and Defendants replied. Pl.'s Mem. Opp. Defs.' Mot. Dismiss Pl.'s Am. Compl., ECF No. 39; Defs.' Reply to Pl.'s Mem. Opp. Defs.' Mot. Dismiss Pl.'s Am. Compl., ECF No. 41. On December 9, 2020, the Court denied in part and granted in part Defendants' Motion to Dismiss. Mem. Op. & Order Den. Part & Grant Part Defs.' Mot. Dismiss, ECF No. 62 ("Dec. Mem. Op. & Order").

Plaintiff filed their first Motion for Class Certification on May 27, 2021. Pl.'s First Mot.

Class Cert. under Rule 23(b)(2), ECF No. 115 ("First Mot. Class Cert."). On August 19, 2021, the Court granted in part and denied in part Plaintiff's First Motion for Class Certification. Mem. Op. & Order. Grant. Part. & Den. Part Pl.'s First Mot. Class Cert., ECF No. 204 ("First Class Cert. Order"). On August 31, 2021, Defendants filed a petition for permission to appeal the Court's Certification Order to the Fourth Circuit Court of Appeals pursuant to FRCP 23(f). Pet. Permission Appeal, ECF No. 229. On September 2, 2021, the Fourth Circuit reversed and remanded the Court's *sua sponte* certification of an 'opt-in' Rule 23(b)(3) damages class. *State Farm Mut. Auto. Ins. Co. v. Elegant Massage, LLC*, No. 21-255, 2021 WL 4202678, at *1 (4th Cir. Sept. 2, 2021). It expressed no opinion on whether a Rule 23(b)(3) class is appropriate in this case, but rather reversed and remanded due to the *sua sponte* nature of the certification and the opt-in provision. *Id.* Accordingly, the Court granted Plaintiff leave to file a new request for class certification, if any. Order Grant. Leave File New Mot. Class Cert., ECF No. 234.

On September 27, 2021, Plaintiff filed their Second Motion for Class Certification. Second Mot. Class Cert.; *see also* Pl.'s Mem. Supp. Pl.'s Second Mot. Class Cert., Appoint. Class Rep. & Appoint. Class Counsel, ECF No. 238 ("Pl.'s Mem. Supp. Cert."). Defendants filed a memorandum in opposition and Plaintiff replied. Defs.' Mem. Opp. Pl.'s Second Mot. Class Cert., Appoint. Class Rep. & Appoint. Class Counsel, ECF No. 249 ("Defs.' Mem. Opp. Cert."); Pl.'s Reply to Defs.' Mem. Opp. Pl.'s Second Mot. Class Cert., Appoint. Class Rep. & Appoint. Class Counsel, ECF No. 263 ("Pl.'s Reply Cert.").

On October 12, 2021, Defendants filed a Motion to Exclude the Testimony and Opinions of Jeffrey E. Meyers. Defs.' Mot. Exclude Meyers; *see also* Defs.' Mem. Supp. Defs.' Mot. Exclude Test. & Op. of Jeffrey E. Meyers, ECF No. 254 ("Defs.' Mem. Supp. Exclude Meyers"). On October 26, 2021, Plaintiff filed a memorandum in opposition and Defendants replied. Pl.'s

Mem. Opp. Defs.' Mot. Exclude Test. & Op. of Jeffrey E. Meyers, ECF No. 269 ("Pl.'s Mem. Opp. Exclude Meyers"); Defs.' Reply to Pl.'s Mem. Opp. Defs.' Mot. Exclude Test. & Op. of Jeffrey E. Meyers, ECF No. 289 ("Defs.' Reply Exclude Meyers").

On October 29, 2021, Plaintiff filed a Motion to Exclude Opinions and Testimony of Stephen D. Prowse for Class Certification, Summary Judgment, and Trial. Pl.'s Mot. Exclude; *see also* Pl.'s Mem. Supp. Pl.'s Mot. Exclude Op. & Test. of Stephen D. Prowse, ECF No. 279 ("Pl.'s Mem. Supp. Exclude Prowse"). Defendants filed a memorandum in opposition and Plaintiff replied. Defs.' Mem. Opp. Pl.'s Mot. Exclude, ECF No. 297 ("Defs.' Mem. Opp. Exclude Prowse"); Pl.'s Reply to Defs.' Mem. Opp. Pl.'s Mot. Exclude, ECF No. 301 ("Pl.'s Reply Exclude Prowse"). Since the cross-Motions to Exclude will bear on the Court's approach to the Second Motion for Class Certification, the Court must decide those two Motions first. *See Soutter v. Equifax Info. Servs. LLC*, 299 F.R.D. 126, 131 (E.D. Va. 2014) ("The demand for a rigorous analysis of the class qualifying factors at the critical class certification stage makes it important that the evidence to be used in making that decision be reliable.").

## II.   LEGAL STANDARD

### A. Expert Testimony Standard

Federal Rule of Evidence 702 permits a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of opinion or otherwise" in a matter if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The guiding principles for Rule 702, as amended in 2000, derive from the

U.S. Supreme Court's decisions in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) and its progeny *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

In *Daubert*, the Supreme Court explained that trial judges take on a "gatekeeping role" when addressing Rule 702 issues. 509 U.S. at 597; *see also Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001). As such, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589.[6] To be relevant, the testimony or evidence must "assist the trier of fact to understand the evidence or to determine a fact in issue" and must be "sufficiently tied to the facts of the case." *Id.* at 591 (internal citations and quotations omitted). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Id.* When determining whether particular expert testimony is reliable, "trial judges must have considerable leeway." *Kumho Tire*, 526 U.S. at 152; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). The reliability analysis must focus on the expert's underlying methodology, not the expert's conclusion itself. *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017); *see also Bourne ex rel. Bourne v. E.I. DuPont de Numours & Co.*, 85 Fed.Appx. 964, 967 (4th Cir. 2004).

This leeway also applies to determining whether a proffered expert is qualified to offer an opinion on the relevant issue in the first place. A plain reading of Federal Rule of Evidence 702 indicates that, preceding the four enumerated criteria for admitting expert testimony, the Rule presumes that an expert is *qualified* "by knowledge, skill, experience, training, or education." FED. R. EVID. 702. Accordingly, the threshold inquiry, when disputed, is whether an expert is qualified to opine on the issue for which he or she is proffered. "The question of whether a

---

[6] While the *Daubert* Court originally confined its analysis and conclusions to scientific evidence and testimony, the Court later clarified in *Kumho Tire* that those principles apply to all proffered expert evidence and testimony, including those based on specialized and technical knowledge. 526 U.S. at 141. The Court also affirmed that the reliability factors set out in *Daubert* are "helpful, not definitive" and "do not necessarily apply even in every instance in which the reliability of scientific testimony is challenged." *Id.* at 151.

witness is qualified to testify is context-driven and can only be determined by the nature of the opinion he offers." *RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc.*, 609 F. App'x 731, 738 (4th Cir. 2015) (quoting *Gladhill v. Gen. Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984)). "[T]here are many different kinds of experts, and many different kinds of expertise." *Kumho Tire*, 526 U.S. at 150. Therefore, "[t]he fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him [or her] to testify as an expert in all related cases." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) (collecting cases). "Where a purported expert witness has neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered, that witness's testimony may be excluded." *Radiance Found., Inc. v. Nat'l Ass'n for the Advancement of Colored People*, 27 F. Supp. 3d 671, 674 (E.D. Va. 2013).

The Supreme Court in *Daubert* emphasized the need for trial judges to have this leeway to mirror the nature of expert witness contributions and to account for their potential impact. *Id.* at 592 ("Unlike an ordinary witness . . . an expert is permitted a wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."). The Fourth Circuit has similarly recognized that "courts should be conscious of two guiding, and sometimes competing, principles: Rule 702 was intended to liberalize the introduction of relevant expert evidence and expert witnesses have the potential to be both powerful and quite misleading." *Hickerson v. Yamaha Motor Corp.*, 882 F.3d 476, 481 (4th Cir. 2018) (internal citations and quotations omitted). Because "[e]xpert evidence can be both powerful and quite misleading . . . the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595; *see also United States v. Dorsey*, 45 F.3d 809, 814 (4th Cir. 1995) ("[A] trial judge has a great deal of discretion

in deciding whether to admit or exclude expert testimony."). Especially "[g]iven the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than enlighten should be excluded." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999); *see also United States v. Garcia*, 752 F.3d 382, 391-92 (4th Cir. 2014) (acknowledging expert witness testimony can be highly influential and, to avoid jury confusion, requires heightened safeguards when individuals serve as both expert and fact witnesses). Thus, the Rule 702 inquiry is ultimately "a flexible one." *Daubert*, 509 U.S. at 594.

### B. Class Certification Standard

Generally, "'[d]istrict courts have wide discretion in deciding whether or not to certify a class and their decisions may be reversed only for abuse of discretion,' recognizing, of course, that this 'discretion must be exercised within the framework of Rule 23.'" *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003) (citing *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 (4th Cir. 2001)). Accordingly, to certify a suit as a class action, the proponent of class certification has the burden of establishing that the conditions enumerated in Rule 23 of the Federal Rules of Civil Procedure have been met. *Windham v. American Brands, Inc.*, 565 F.2d 59, 64 n. 6 (4th Cir. 1977) (en banc) *cert. denied*, 435 U.S. 968 (1978). Specifically, the moving party must prove it satisfies all four of the elements of Rule 23(a) and one of the subsections of Rule 23(b). FED. R. CIV. P. 23; *see also Pitt v. City of Portsmouth, Va.*, 221 F.R.D. 438, 443 (E.D. Va. 2004). Rule 23 provides, in pertinent part:[7]

> (a) **Prerequisites to a Class Action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

---

[7] Plaintiff has moved for class certification pursuant to Rule 23(b)(3). *See* Second Mot. Class Cert.

(b) **Class Actions Maintainable.** An action may be maintained if the prerequisites of subdivision (a) are satisfied, and in addition:

> ...
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*Id.* The Court must conduct a "rigorous analysis" in determining whether the requirements of Rule 23 have been met. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161 (1982); *Chisolm v. TranSouth Fin. Corp.*, 184 F.R.D. 556, 560 (E.D. Va. 1999) (holding the same). In conducting its rigorous analysis of Rule 23, the Court must take a "close look at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." *Thorn v. Jefferson—Pilot Life Ins. Co.*, 445 F. 3d 311, 319 (4th Cir. 2004) (internal quotations omitted). "Such findings can be necessary even if the issues tend to overlap into the merits of the underlying case." *Id.*

## III.   DISCUSSION

### A. Expert Testimony

#### a.   Defendants' Motion to Exclude Jeffrey E. Meyers

Plaintiff includes and relies upon the report of proffered expert Mr. Jeffrey E. Meyers in support of their instant Motion for Class Certification. Decl. of Melissa L. Troutner Supp. Pl.'s Second Mot. Class Cert. under Rule 23(b)(3) Ex. 24, ECF No. 239 ("Meyers Report"). Defendants move to exclude Mr. Meyers' proffered expert opinions and testimony. Defs.' Mot. Exclude. Defendants argue, specifically, that Meyers is not qualified, his process is

not reliable, his process does not fit Plaintiff's liability theory, and that his opinions and reports "are nothing but handoffs from Plaintiff's counsel." *See* Defs.' Mem. Supp. Exclude.

### i.  *Mr. Meyers is Qualified*

The threshold inquiry in deciding whether to exclude proffered expert opinion and testimony, when disputed, is whether the expert is qualified to opine on the issue for which he or she is proffered. *See* FED. R. EVID. 702. Defendants argue Meyers is not qualified to "sponsor a damages process for a putative class." Defs.' Mem. Supp. Exclude at 21-22. Specifically, Defendants contend that although Meyers has performed case-by-case business interruption assessments, "he is not an expert with respect to the damages of a putative class," "has never provided expert testimony with respect to a common methodology," and has never done so in the COVID-19 context. *Id.* These contentions directly contradict the extensive qualifications that Meyers outlines in his report. *See* Meyers Report at 2. Specifically, Meyers notes he has performed hundreds of business interruption calculations for both insurers and insureds utilizing the same type of common methodology described in his report, developed a business interruption calculator for an insurer that the insurer used to calculate loss of income for insureds, and has developed course material for business interruption continuing education classes. *Id.*

Defendants rely primarily on Meyers' inexperience in class actions. They argue that "Meyers['] experience with respect to the BP settlement is inadequate to qualify Meyers to create a common methodology for calculating class-wide damages." Defs.' Mem. Supp. Exclude at 21. They argue this experience does not qualify Meyers because the settlement was "not subject to the rigors of *Daubert*" and "accounted for the individualized nature of differing business' claims, which Meyers' process does not." *Id.* Meyers' deposition testimony reveals, however, that the BP settlement agreement "qualified tens of thousands of individuals and hundreds of thousands

of businesses." Defs.' Mem. Supp. Exclude Ex. A at 40:17-19. As part of his role with that agreement, Meyers' "worked with . . . at least over a thousand individual settlement participants in doing their calculation of losses" using a specific calculation. *Id.* at 41:10-15. Even if his experience with class actions, in particular, is not extensive, Meyers nonetheless possesses ample experience calculating the exact type of damages required in this case and on an expansive scale.

Thus, the Court finds that Mr. Meyers is qualified by "knowledge, skill, experience, training, []or education" to opine on class-wide damages for insurance business interruption claims and, if so, to perform that calculation. *Radiance Found.*, 27 F. Supp. 3d at 674.

### ii. *Mr. Meyers' Process is Reliable*

Defendants next argue that Meyers' opinions should be excluded as unreliable for various reasons. Defs.' Mem. Supp. Exclude at 14. When determining whether particular expert testimony is reliable, "trial judges must have considerable leeway." *Kumho Tire*, 526 U.S. at 152. The reliability analysis must focus on the expert's underlying methodology, not the conclusion itself. *Bresler*, 855 F.3d at 195.

### 1. Testing, Peer Review, and General Acceptance

Defendants first allege that Meyers has not shown that his proposed process has been or can be tested. Defs.' Mem. Supp. Exclude at 14 (quoting *Daubert*, 509 U.S. at 593). Yet, in his deposition, Meyers clearly states that he has tested his methodology "[t]housands of times" by "actually preparing business interruption losses" over the last sixteen years of his career. *Id.* at Ex. A, at 184:01-10. Defendants' challenge the reliability based on the fact that Meyers has not used this methodology on a class-wide basis but offer no support as to how doing so would be different from the thousands of tests he has already performed. Indeed, class actions already contemplate that calculations may need to be conducted on an individual basis. *See Gunnells*,

348 F.3d at 427–28 ("Rule 23 explicitly envisions class actions with such individualized damage determinations."). The issue, therefore, is not whether the methodology has been tested in a class action, specifically, but whether it has been tested such that it can reliably be used as a method of common proof in a class action. The Court is satisfied that the thousands of tests Meyers has done for this methodology over the last sixteen years indicate that it is reliable under this *Daubert* factor.

Defendants haphazardly lodge various criticisms about the way and extent to which Meyers' methodology accounts for differences in individual businesses. Defs.' Mem. Supp. Exclude at 14-18. Most of these conclusory criticisms, which Plaintiff alleges are untrue, are not accompanied by any authority – whether that be case law, authoritative literature, or even citations to Meyers' reports or deposition – to guide the Court to why or how the specific methods Meyers uses are incorrect or unreliable. Another criticism is that Meyers "does not compare any results of his process against any results" from State Farm's methodology "or how State Farm actually calculates Loss of Income in the real world." Defs.' Mem. Supp. Exclude at 17. Yet, Meyers spends seven pages of his report comparing his "Loss of Income Calculator" to State Farm's own methodology as outlined in their own internal "Leader Guide." *See* Meyers Report at 7-13. Moreover, this criticism is particularly unpersuasive in light of Meyers' involvement in preparing numerous business interruption claims under State Farm policies, which State Farm accepted and paid. Pl.'s Mem. Opp. Exclude at 10.

Defendants also assert that Meyers has never published or otherwise subjected his process to peer review, and challenge whether his process is "generally accepted." Defs.' Mem. Supp. Exclude at 18. Yet, in his deposition, Meyers specifically states: "The methodology that I have employed in this matter is based upon all the peer-reviewed data and has been utilized in

the industry and by my peers, both – whether it be the AICPA or the NACVA, routinely and consistently in accordance with the calculator I've prepared herein." *Id.* at Ex. A, at 183:16-21. Of note, the *Daubert* list of reliability factors for courts to consider, including whether a proposed theory or technique has been subject to peer review and whether it is generally accepted, is not exhaustive. *Daubert*, 509 U.S. at 593-94. In *Kumho Tire*, the Court affirmed that the list of factors "neither necessarily nor exclusively applies to all experts or in every case." 526 U.S. at 137. Thus, even if Meyers' process does not meet all of the factors set out in *Daubert*, the Court still has authority to find it reliable. *RG Steel*, 609 F. App'x at 738 ("The question of whether a witness is qualified to testify is context-driven and can only be determined by the nature of the opinion he offers."). Even under the standards that Defendants challenge, moreover, the Court finds that Meyers' common methodology has been sufficiently tested and generally accepted by the industry such that it is reliable, and therefore admissible.

### 2. Analytical Gap

Second, Defendants claim Meyers' process reflects too great an analytical gap between the data and the opinion proffered. Defs.' Mem. Supp. Exclude at 18. However, Defendants rely solely on the authority of *ePlus, Inc. v. Lawson Software, Inc.*, which was a patent infringement case that dealt with a claim for reasonable royalties. 764 F. Supp. 2d 807, 809 (E.D. Va. 2011), *aff'd*, 700 F.3d 509 (Fed. Cir. 2012). The Court finds it illogical to rely on the standard set there because patent cases are particularly unique, and Defendants do not provide any support to indicate that case is analogous to an insurance breach of contract action. The remaining arguments Defendants lodge on this issue similarly lack any authority to guide the Court.

### 3. Extra Expense

Third, Defendants assert Meyers' methodology is unreliable because he "has no

14

particular mechanisms to address the two remaining damage elements, Extended Loss of Income and Extra Expenses." Defs.' Mem. Supp. at 20. In his report, however, Meyers provides his calculations and methods for doing those two very things. *See* Meyers Report at 15, Ex. C.

### iii.  *Mr. Meyers' Process Fits Plaintiff's Liability Theory*

Defendants next argue that Meyers' process should be excluded because it "does not 'fit' Plaintiff's liability theory." Defs.' Mem. Supp. at 22. In other words, Defendants challenge whether Meyers' process is sufficiently tied to the facts of the case. *Id.* (citing *Daubert*, 509 U.S. at 591). Specifically, Defendants assert that Meyers' process "would award Plaintiff losses attributable to both the economic effects of the pandemic and the government orders even though Plaintiff's liability theory is limited to only losses attributable to the government orders." *Id.* (internal emphasis omitted). In support, Defendants cite to various parts of Meyers' reports in which he uses language that they construe to differentiate between the Orders and the pandemic. Yet, on the very same page that they cite, Meyers himself emphasizes that the Orders and the pandemic are inextricable and criticizes Defendants' expert for making the very mistake that Defendants allege against Meyers. *See id.* at Ex. B, at ¶ 33 (criticizing Dr. Prowse for "fail[ing] to properly consider State Farm's representation that the Executive Orders were issued in response to the COVID-19 pandemic."); *see also id.* at ¶ 35 ("Had the COVID-19 pandemic not occurred, there would have been no Executive Orders and no Covered Cause of Loss under the Policies."). Defendants attempts to misconstrue Meyers' approach is therefore unavailing.

### iv.  *Handoffs*

Finally, Defendants argue that Meyers' opinions and reports are "nothing but handoffs from Plaintiff's counsel." Defs.' Mem. Supp. Exclude at 25 (quoting *In re James Wilson Assocs.*, 965 F.2d 160, 173 (7th Cir. 1992)). However, Defendants fail to cite to any authority to support

this accusation. Therefore, the Court finds it without merit.

In sum, the Court finds that Meyers is sufficiently qualified and his process sufficiently reliable such that it is admissible. Accordingly, Defendants' Motion to Exclude is **DENIED**.

      b.  <u>Plaintiff's Motion to Exclude Stephen D. Prowse</u>

Defendants include and rely upon the declaration and report of proffered expert Dr. Stephen D. Prowse in their opposition to Plaintiff's Motion for Class Certification. Defs.' Mem. Opp. Cert. Ex. 1 (filed under seal) ("Prowse Report"). Plaintiff moves to exclude Dr. Prowse's proffered expert opinions and testimony for class certification, summary judgment, and trial. Pl.'s Mot. Exclude. In support, Plaintiff offers multiple arguments, including that Dr. Prowse is not qualified to serve as a damages expert here and that his opinions are irrelevant and unreliable. *See* Pl.'s Mem. Supp. Exclude.

        *i.  Dr. Prowse is Not Qualified to Opine on Damages in this Case*

The threshold inquiry in deciding whether to exclude proffered expert opinion and testimony, when disputed, is whether the expert is qualified to opine on the issue for which he or she is proffered. *See* FED. R. EVID. 702. Plaintiff argues that Dr. Prowse is unqualified to opine on business interruption claims and the calculation of loss of income and extra expense damages under the Policy. Pl.'s Mem. Supp. Exclude at 7. In support, Plaintiff asserts that Dr. Prowse is a general economist who has no experience handling business interruption claims or calculating damages based on loss of income and extra expenses. *Id.* In opposition, Defendants refer to Dr. Prowse's professional history and education, his experience serving as an expert, and that numerous courts have admitted his testimony as a damages expert, including in putative class actions. Defs.' Mem. Opp. Exclude at 5-6.

The Court finds that Dr. Prowse is not qualified to opine on whether it is possible by

generalized proof to calculate class-wide damages for insurance business interruption claims and, if so, to perform that calculation. Dr. Prowse has been a full-time economic consultant since 1998. Prowse Report at ¶ 9. He currently serves as a Senior Managing Director in the Forensic and Litigation Services Practice at FTI Consulting, Inc., and a guest lecturer in economics and finance at the Cox School of Business at Southern Methodist University. *Id.* at ¶¶ 7, 9. One of Dr. Prowse's responsibilities is to provide economic, financial, and damage quantification consulting services; he has done so in class certification, intellectual property, antitrust, breach of contract, fraud, securities-related, and wrongful termination cases, among others. *Id.* at ¶ 8. He received his B.A. in economics from Cambridge University, his M.S. in economics from the California Institute of Technology, and his Ph.D. in economics from the University of California at Los Angeles. *Id.* at ¶ 10. He is also a CFA Charterholder and a member of the Licensing Executives Society. *Id.* He has authored over twenty articles on economic and financial issues that have been published in peer-reviewed academic journals, books, and other outlets. *Id.*

Despite his impressive pedigree, Dr. Prowse is not qualified to serve as a damages expert in this case. During Plaintiff's deposition of him, Dr. Prowse conceded that he has no formal education in insurance and has never taken a course on claims adjustment. *See* Decl. of Melissa L. Troutner Supp. Pl.'s Mem. Supp. Mot. Exclude Op. & Test. of Stephen D. Prowse, Ex. 5 at 43:12-17, ECF No. 280 ("Troutner Decl."). While he "may have" taken a course on business interruption in the past, if he did, it was an "internal" "general learning course" that his employer offered "[p]robably more than ten" years ago. *Id.* at 43:18-44:20. He has authored many publications, but none of them pertain to insurance coverage nor the submission of an insured's claim under a specific insurance policy. *Id.* at 57:06-21. Indeed, Dr. Prowse acknowledges that his publications focus primarily on antitrust, corporate governance, corporate finance, and

financial systems. *Id.* at 58:06-11. Moreover, although Dr. Prowse has previously calculated losses or damages for business interruption claims, he has never done so for an insurer nor developed a methodology for calculating such losses for an insurer. *Id.* at 60:17-21; 63:08-12. He has calculated loss of income claims on behalf of insureds in the past, but the last time he did so was over ten years ago. *Id.* at 60:22-61:18. Later in his deposition, he admits that he cannot remember the last time he analyzed factors regarding business interruption claims under a specified insurance policy; the closest estimate he offers is that he did so within the last 25 years. *Id.* at 139:09-140:04. Further, Dr. Prowse believes he may have offered an expert opinion about calculating loss of income or business interruption losses under a specified insurance policy in a case a number of years ago, but he concedes that he does not identify that matter as part of the materials accompanying his report. *Id.* at 62:04-63:03. Finally, his experience calculating class-wide damages is limited to patent and securities litigation cases. *Id.* at 63:13-64:05.

The Court recognizes Defendants' argument that Dr. Prowse need not be an expert in insurance in order to qualify as a damages expert in this case. *See RG Steel*, 609 F. App'x at 739 (acknowledging that experts do not need to "have prior experience with the particular subject the testimony concerns" to offer an opinion). The ultimate issues regarding Dr. Prowse's qualification, therefore, are not his inexperience with insurance, but rather his inexperience with calculating class-wide damages for insurance business interruption claims and that the last time he did so on an individual basis was at least ten years ago. The Fourth Circuit has recognized that experience and expertise in one area does not automatically qualify someone as an expert in another similar area. *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 247 (4th Cir. 1999) ("[Expert] had previously consulted in an array of cases involving the mechanical design and safety of various industrial products, but he had no particularized experience or expertise in evaluating

either automobile manufacturing processes or the strength of plastic automobile component parts."); *see also Shreve*, 166 F. Supp. 2d at 392 (collecting cases to support "[t]he fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas," and excluding a proffered expert because "an expert who is a mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering").

With respect to expertise and specialized knowledge for damages calculations, in particular, Defendants' reliance on Fourth Circuit and other circuit case law is inapposite. In *RG Steel*, for instance, the Fourth Circuit recognized that the economics of a particular field could be "so *sui generis* such that an expert's lack of expertise in . . . these specific areas necessarily disqualifies him from giving an expert opinion." 609 F. App'x at 739 (quoting *Belk, Inc. v. Meyer Corp., U.S.*, 679 F.3d 146, 162 (4th Cir. 2012)). The case law outside the Fourth Circuit to which Defendants cite stands for the same principle. *See, e.g., Regal Cinemas, Inc. v. W & M Properties*, 90 F. App'x 824, 833 (6th Cir. 2004) (finding an expert qualified who "specialized in damages analysis such as the one performed in this case."); *Nielsen Audio, Inc. v. Clem*, 2017 WL 1483353, at *2 (M.D. Fla. Apr. 24, 2017) ("An individual need not be an expert in a particular field to offer an expert opinion on damages that is based on *broadly applicable* calculations and measurements." (emphasis added)). Unlike the plaintiffs in those cases, the Plaintiff in this case has met the "*sui generis*" burden and demonstrated that Dr. Prowse's proffered opinion calls for specific expertise he does not have. *RG Steel*, 609 F. App'x at 739.

To be clear, the distinction here is that Dr. Prowse does not need to be an insurance expert, but he does need sufficient specialized knowledge to analyze whether it is possible to calculate class-wide damages for business interruption claims under a specific insurance policy.

Plaintiff has demonstrated he lacks that specialized knowledge. Specifically, Plaintiff notes that Dr. Prowse's experience calculating class action business interruption damages in the patent and securities contexts are fundamentally different than the type of calculation he is proffered as an expert to perform in this case. Pl.'s Mem. Supp at 1-3. Plaintiff also highlights, as will be discussed further, that this difference is evident from Dr. Prowse's "improper application of a lost profits damages theory to this breach of contract action." *Id.* at 1. Defendants fail to address Plaintiff's argument regarding this difference and to demonstrate that Dr. Prowse's experience translates to the insurance context. *See Shreve*, 166 F. Supp. 2d at 391. Therefore, the Court cannot assume that Dr. Prowse is qualified to calculate damages in this case just because Dr. Prowse is an economist who may be an expert in calculating certain other types of damages. Moreover, the Court cannot rely on Dr. Prowse's experience calculating business interruption claims on an individual basis for insureds because the last time he did so was at least ten years ago. *See Holloway v. City of Virginia Beach*, 531 F. Supp. 3d 1015, 1074 (E.D. Va. 2021) (finding proffered expert unqualified to testify on racial polarized voting, in part, because he last taught a course on the Voting Rights Act ten years ago).

In sum, the Court finds that Dr. Prowse is not qualified by "knowledge, skill, experience, training, nor education" to opine on one of the issues for which he is proffered: whether it is possible by generalized proof to calculate class-wide damages for insurance business interruption claims and, if so, to perform that calculation. *Radiance Found.*, 27 F. Supp. 3d at 674.

### ii.  *Dr. Prowse's Report is Irrelevant to the (b)(3) Class*

The Court also finds that Dr. Prowse's report is overall irrelevant for purposes of analyzing the (b)(3) Class. Given the litigious nature of this case, there are several important disclaimers about Dr. Prowse's report that must be noted. First, Dr. Prowse's report, dated July

20

27, 2021, addresses Plaintiff's Declaratory Judgment Class, which Plaintiff proposed in its First Motion for Class Certification under FRCP 23(b)(2). *Id.* at ¶ 3 (Dr. Prowse lists his understanding of the proposed class to be the Declaratory Judgment Class, citing "Plaintiff's Motion for Class Certification Under Rule 23(b)(2), p. 1."). This is appropriate given Plaintiff filed the (b)(2) Motion in May 2021 and it remained pending until August 2021. *See* First Mot. Class Cert.; First Class Cert. Order. Defendants decided to rely on this same report again in opposition to the instant Motion for Class Certification under FRCP 23(b)(3). *See* Defs.' Mem. Opp. Cert. Accordingly, the Court recognizes that Dr. Prowse's analyses and conclusions do not specifically pertain to the proposed (b)(3) Class before the Court by no fault of his own.

While Defendants argue Dr. Prowse's report remains relevant here, a review of the report reveals that his analyses and conclusions rely upon and pertain exclusively to the defined (b)(2) Class. *See, e.g.*, Prowse Report at ¶ 17-23 (offering explanations for the variation in economic positions of "some proposed class members"). Indeed, the Court finds that Dr. Prowse's generalized proof analysis is inextricable from his understanding of the proposed class as the (b)(2) Class, which is meaningfully different from the proposed (b)(3) Class currently before the Court. The proposed (b)(2) Declaratory Judgment Class is defined as: "All persons or entities in the Commonwealth of Virginia with a Businessowners insurance policy issued by State Farm on Form CMP-4100, including a Loss of Income and Extra Expense endorsement on Form CMP 4705.1 or CMP 4705.2, in effect at any time between March 23, 2020 through June 30, 2020." First Class Cert. Mot. at 1. The proposed (b)(3) Class is defined as: "All persons or entities in the Commonwealth of Virginia with a Businessowners insurance policy issued by State Farm on Form CMP-4100, including a Loss of Income and Extra Expense endorsement on Form CMP 4705.1 or CMP 4705.2, in effect at any time between March 23, 2020 and June 30, 2020 (the

21

'Closure Period'), *that were subject to partial or full business suspension under the Orders and submitted claims for business income losses and/or extra expenses incurred during the Closure Period that were denied by Defendants*." Second Class Cert. Mot. at 1-2 (emphasis added).

Among other reasons, the fact that the (b)(3) Class essentially limits the (b)(2) Class to businesses that were "subject to partial or full" closures, "under the Orders," and "submitted claims . . . that were denied by Defendants" makes this Class meaningfully different. Moreover, it renders irrelevant much of Dr. Prowse's report because his analyses and conclusions do not account for these nuances when assessing whether it is possible to calculate economic injury *for the proposed class* by generalized proof.[8] Ultimately, to ask the Court to decide what parts of the generalized proof analysis remain relevant to the (b)(3) Class would require a sentence-by-sentence determination that would ultimately be futile because Dr. Prowse's report relies and remains inextricable from his understanding of the proposed class as the (b)(2) Class. Accordingly, the Court must exclude Dr. Prowse's report from its consideration of the instant Class Certification Motion.

### iii.   Dr. Prowse's Report is Unreliable

Even if, as Defendants argue, Dr. Prowse's report were relevant to the (b)(3) Class, the Court nonetheless finds that his report is unreliable. According to Dr. Prowse, Defendants retained him "to conduct analyses and to provide expert testimony, if necessary, regarding various economic issues." Prowse Report at ¶ 1. Specifically, Defendants asked Dr. Prowse (1) "to determine whether the fact of economic injury can be determined by generalized proof, or

---

[8] On the other hand, Plaintiff's expert Mr. Meyers does not limit his analysis to the proposed class. *See* Meyers Report at 1. Rather, his analysis pertains to "whether there is a common methodology to calculate the Loss of Income and Extra Expense for the State Farm Virginia Insureds, beginning March 25, 2020, upon Governor Northam's Executive Order No. 53 ('EO 53') and to describe that common methodology." *Id.* His report does not discuss nor offer conclusions on any proposed class, but rather focuses on the policy at issue, his common methodology, and whether that can be applied to "Virginia Insureds" generally. *See id.* at 3-8.

whether an examination of the specific facts and circumstances related to each proposed class member is required to determine whether, in fact, each individual was economically harmed by the Executive Orders and the amount of such economic harm, if any"; (2) "to examine the specific facts and circumstances of the Named Plaintiff to determine whether the Named Plaintiff was economically harmed by the Executive Orders"; and (3) "to review the Report of Jeffrey Meyers ('Meyers Report') and provide rebuttal, if any." *Id.* Dr. Prowse defines "economic injury" as "whether the defendants' alleged unlawful conduct was the cause of any economic harm suffered by an individual." *Id.* at ¶ 17. He explains that economic injury is established "if the plaintiff's actual economic position leaves him or her less well off than his or her 'but-for' economic position." *Id.* Dr. Prowse defines the 'but-for' economic position as "the economic position the policyholder would have been in had the Executive Orders not been issued." *Id.* at ¶ 18. He notes that the "but-for" economic position is "different than the economic position the policyholder would have been in had the COVID-19 pandemic not occurred." *Id.*

As a preliminary matter, because the Court has already determined that Dr. Prowse is unqualified to opine on whether it is possible to calculate class-wide damages here and because his analysis of such is irrelevant to the instant class, it need not discuss whether his methodology and generalized proof analysis are reliable. *Daubert*, 509 U.S. at 598 ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."). The Court nonetheless finds that the remaining portions of Dr. Prowse's report are unreliable because Dr. Prowse goes far beyond the question of damages and the scope of his purported expertise. In his report, Dr. Prowse improperly opines on legal issues properly reserved for the Court when he addresses the "typicality" of Plaintiff's claim and the "cohesiveness" of the proposed class. Prowse Report at 14-16. Dr. Prowse is not a lawyer nor a

member of defense counsel; accordingly, it is inappropriate for him to opine on these issues. *United States v. Frazier*, 387 F.3d 1244, 1262–63 (11th Cir. 2004) ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."). The Court understands that Dr. Prowse was asked to determine whether generalized proof is possible here, but it still finds that Dr. Prowse overextended by essentially offering a legal opinion.

Further, Dr. Prowse opines on factual issues properly reserved for the trier of fact, such as the potential reasons Plaintiff decided to permanently close its business. Prowse Report at 11-13. Dr. Prowse is not qualified to testify to these factual issues and does not have the personal knowledge to testify to them. Indeed, in his deposition, Dr. Prowse admits that "ultimately [why Plaintiff permanently closed] will be decided by a trier of fact." Troutner Decl. Ex. 5, at 136:15-137:16. Moreover, the Court finds that there is no need for Dr. Prowse to opine or testify to factual issues that lay witnesses are better positioned and adequately able to cover themselves if this action goes to trial. The Court finds that Dr. Prowse's testimony on these issues would create jury confusion because the jury would likely conflate his testimony as an expert and fact witness. *See Garcia*, 752 F.3d at 392.

Accordingly, Plaintiff's Motion to Exclude the Opinions and Testimony of Dr. Stephen D. Prowse is **GRANTED IN PART**. Specifically, the Court concludes that Dr. Prowse is unqualified to opine on business interruption claims and the calculation of loss of income and extra expense damages under the Policy. The Court also concludes that Dr. Prowse's opinions and testimony set forth in his report intrude on the purview of the Court and trier of fact. Therefore, the Court will exclude Dr. Prowse's opinion and testimony on the issue for which he is unqualified and will exclude his report. However, because Plaintiff moves to exclude his

opinion and testimony for summary judgment and trial, the Court limits its exclusion ruling to this particular issue and report. The Court will reserve its ruling on Dr. Prowse's opinion and testimony on other issues and at other stages until they are properly before the Court.

## B. Class Certification

To conduct a sufficient analysis of Plaintiff's Motion, the Court must apply relevant facts within Plaintiff's Amended Complaint to Rule 23(a) and (b). The Court will evaluate Plaintiff's Motion under Rule 23. As a threshold matter, however, Defendants argue that Plaintiff's Motion is waived, forfeited, and untimely. Defs.' Mem. Opp. Cert. at 5. Further, Defendants ardently contest the applicability of Rule 23(a) and (b)(3), arguing that common questions do not predominate because Plaintiff and proposed class members are not similarly situated and cannot rely upon common evidence. *Id.* at 7-17. The following analysis addresses the threshold matter Defendants raise and proceeds to analyze the Rule 23 class action requirements in turn.

### 1.   Waiver, Forfeiture, and Timeliness

Defendants, as a threshold matter, argue that the Court should summarily reject Plaintiff's Motion as waived, forfeited, and untimely. Defs.' Mem. Opp. Cert. at 5. Specifically, Defendants point to Plaintiff's decision to move to bifurcate its proposed (b)(2) and (b)(3) classes on May 26, 2021, and its subsequent decision to move for class certification under (b)(2). *Id.* (citing Pl.'s Mot. to Bifurcate, ECF No. 111; First Mot. Class Cert). In making the "strategic decision" to move for bifurcation and to certify only a (b)(2) class, rather than concurrently filing a motion to certify a (b)(3) class, Defendants conclude that Plaintiff "waived and, at the very least, forfeited the right to seek certification of a 23(b)(3) class." *Id.* They did not.

Defendants claim that Plaintiff violated Rule 23(c)(1)(A) in filing the Instant Motion. *Id.* at 17. However, nothing in Rule 23, the Local Rules applicable to this Court, nor the Scheduling

Order in this action precluded Plaintiff from filing its Motion to Bifurcate when they did. Rule 23(c)(1)(A), regarding certification orders, states that "[a]t an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Defendants do not attempt to define "[a]t an early practicable time," but rather simply assert that "it cannot mean at a time after the date for which the Court has scheduled the trial of the matter" and after Plaintiff's first class certification motion "was made and denied." Defs.' Mem. Opp. Cert. at 6.

Regardless of the merits of the Motion to Bifurcate, Plaintiff's decision to immediately file its First Motion for Class Certification pursuant to Rule 23(b)(2) was consistent with its Motion to Bifurcate and, if anything, made litigation in this action more expeditious. Indeed, if the Court had granted the Motion to Bifurcate, thus allowing the declaratory relief claim under (b)(2) to go forward, and Plaintiff had not yet filed the First Motion for Class Certification, this action would have been further delayed. Moreover, regardless of any "strategic decisions" involved, the Motion to Bifurcate specifically asked this Court to bifurcate this action into two phases: the first addressing declaratory relief on behalf of a Rule 23(b)(2) class, and the second addressing certification under Rule 23(b)(3). Pl.'s Mot. to Bifurcate at 1. Defendants acknowledge that the bifurcation Motion asked the Court to allow Plaintiff to "defer moving for a (b)(3) class," not to intentionally relinquish, abandon, or explicitly withdraw that motion. *See Wood v. Milyard*, 566 U.S. 463, 474 (2012) ("[W]aiver is the 'intentional relinquishment or abandonment of a known right.'"); *United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014) ("A party who identifies an issue, and then explicitly withdraws it, has waived the issue."). Accordingly, the Court finds that Plaintiff did not waive their right to file the instant Motion.

2. <u>Rule 23(a)</u>

   a. *Numerosity*

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable." This Court, among others, has previously held that "classes consisting of forty or more members are considered sufficiently large to satisfy the impracticability requirement." *American Sales Company, LLC v. Pfizer, Inc.*, 2017 WL 3669604, at *6 (E.D. Va. July 28, 2017); *see also Meijer, Inc. v. Warner Chilcott Holdings Co. III., Ltd.*, 246 F.R.D. 293, 301 (D.D.C. 2007) (quoting *Thomas v. Christopher*, 169 F.R.D. 224, 237 (D.D.C. 1996)) (finding the numerosity requirement satisfied by a class of thirty members).

Here, Defendants do not contest the numerosity of the proposed class. *See* Defs.' Mem. Opp. Cert. at 7. Plaintiff purports to represent "policyholders in Virginia with Policies who submitted claims for business income losses and/or extra expenses, which were denied." Pl.'s Mem. Supp. Cert. at 20. They assert that, thus far, Defendants have "produced the claims files of at least 111" policyholders "that were issued one of the Policies, filed a claim for losses caused by the Orders, and whose claims were denied." *Id.* at 14 (citing *id.* at Ex. 2). The Court recognizes that this number reflects Defendants' last known production of claim files and may change – whether by increasing or decreasing – in light of the evolution of this litigation and the definition of the proposed class. Even if the number of proposed class members fluctuates, however, the Court finds that there is sufficient latitude to meet the numerosity requirement. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (It is inherent in the concept of class certification that there must be a "readily identifiable" set of putative class members). Therefore, the Court finds that Plaintiff satisfied the Rule 23(a)(1) numerosity requirement because the joinder of all 111 proposed class members is impracticable.

### b.  Commonality & Typicality

The commonality and typicality requirements tend to merge. While Rule 23(a)(2) requires that questions of law or fact be common to the class, Rule 23(a)(3) similarly requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (quoting *Gen. Tel.*, 457 U.S. at 157). "A common question is one that can be resolved for each class member in a single hearing, such as the question of whether an employer engaged in a pattern and practice of unlawful discrimination against a class of its employees." *Thorn*, 445 F.3d at 318.

Here, Plaintiff alleges that all proposed class members purchased and were issued an identical Policy from Defendants, the Orders affected all members, and Defendants denied every claim filed for loss of income and/or extra expenses submitted by members. Pl.'s Mem. Supp. Cert. at 15. Specifically, Plaintiff asserts that the "questions of law and fact common to the Class," include "*inter alia*, whether: (1) the term 'accidental direct physical loss' in the Policies includes losses resulting from the Orders; (2) Plaintiff's and Class Members' loss of income and/or extra expenses were caused by a 'Covered Cause of Loss' under the Policies; (3) the Loss of Income and Extra Expense Endorsements provide coverage for losses stemming from the Orders; (4) Defendants breached their contracts of insurance by erroneously interpreting Policy provisions and wrongfully denying claims for loss of income and/or extra expenses under the Policies; (5) Defendants breached their implied covenant of good faith and fair dealing to Plaintiff and members of the Class by engaging in a uniform scheme to deny all claims submitted by Class members without conducting any investigation; and (6) Plaintiff and members of the

Class have been damaged by Defendants' conduct." *Id.* at 16.

However, Defendants contend that the "impact, if any, the Orders had on a particular business's operations is not a question amenable to a classwide [sic] answer." Defs.' Mem. Opp. Cert. at 8. Further, despite identical policy language, Defendants assert that "the rights pursuant to that language, and accordingly the injuries, differ significantly among putative class members because their claims present significant factual variations." *Id.* In particular, Defendants dispute Plaintiff's claim that the Orders had a uniform effect on Virginia businesses because, "by their express terms," the Orders imposed different rules and restrictions depending on the nature of the business. *Id.* at 9. Of the 111 already-identified proposed class members, Defendants list several examples of members whose businesses were permitted to remain open to various degrees under the Orders. *Id.* at 10-12 (listing businesses, including retail and others, that were not required to close at all, restaurants that were allowed to remain open for delivery and/or take-out, and businesses that voluntarily closed before the first Order was issued). This variation, Defendants argue, demonstrates that policy coverage is not a class-wide issue. *Id.* at 12.

Yet, the differences in the impact of the Orders on proposed class members is not the common injury alleged in this case. *Wal-Mart*, 564 U.S. at 350-51. Rather, Plaintiff alleges that the injury here occurred when Defendants uniformly denied every claim filed for loss of income and/or extra expenses that class members submitted. Pl.'s Mem. Supp. Cert. at 15. Indeed, because this is a breach of contract and breach of implied covenant of good faith and fair dealing case, all of the questions that Plaintiff alleges are at issue involve the meaning of Defendants' policy and the impact of Defendants' conduct. Similarly, the Court finds unavailing Defendants' attempts to distinguish the case law to which Plaintiff cites. *See* Defs.' Mem. Opp. Cert. at 12-14. Like the courts in those cases, this Court finds that, *inter alia*, the ultimate common questions –

of whether Defendants correctly interpreted their Policy and whether Defendants concocted a scheme to uniformly deny all claims based on that erroneous interpretation – apply to all proposed class members and can be resolved in a single hearing. *Thorn*, 445 F.3d at 318. These common questions likewise have common defenses, such as the ones Defendants have already asserted throughout this litigation. *See, e.g.*, Defs.' Mot. Dismiss Pl.'s First Am. Compl., ECF No. 29. Thus, because these questions are common across each purported class member, the Court finds that there is commonality. *See Thomas v. FTS USA, LLC*, 312 F.R.D. 407, 417 (E.D. Va. 2016) (holding that the class's claims "must depend upon a common contention . . . of such a nature that it is capable of class wide resolution").

Meanwhile, typicality ensures that "only those plaintiffs who can advance the same factual and legal arguments may be grouped together as a class." *Brousard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir. 1998). Additionally, typicality will be established by plaintiffs and all class members alleging the violations by defendants. *See In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002). Plaintiff's and the proposed class members' claims arise from the same factual allegations and conduct that Defendants allegedly committed. Plaintiff and the proposed class bring "breach of contract and covenant of good faith and fair dealing claims [that] arise from State Farm's uniform course of conduct." Pl.'s Mem. Supp. Cert. at 17. Specifically, Plaintiff alleges that State Farm "wrongfully interpreted the Policy Provisions in the same way as to all Class members, putting its own interest before insureds by developing a common scheme to deny all claims for losses caused by the Orders to limit its own financial exposure, then summarily denying all claims stemming from the Orders." Pl.'s Mem. Supp. Cert. at 17 (internal emphasis omitted).

However, Defendants challenge typicality based on specific factual allegations regarding

the closure of Plaintiff's business, both temporary and permanent. *See* Defs.' Mem. Opp. Cert. at 16-17. They claim the "individual factual issues" in Plaintiff's case raise "substantial defenses" that State Farm is entitled to litigate. *Id.* at 17. As Defendants themselves argue, however, typicality does not require "that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned" so long as the variation in claims does not "strike[] at the heart of the respective causes of actions." *Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). Defendants raise disputed factual allegations that will ultimately be decided by the trier of fact. Therefore, the Court cannot rely on them in the first place to demonstrate that Plaintiff's claim is atypical. Moreover, Defendants' contention that the Orders affected different businesses "in fundamentally different ways" is insufficient to defeat Plaintiff's showing that their claims "arise from the same course of events" and similar legal arguments to prove Defendants' liability. Pl.'s Mem. Supp. at 18 (internal citations omitted). The various impacts of the Orders, in other words, do not disqualify Plaintiff because the ultimate bases for Plaintiff's and the proposed class members' claims are the Policy and Defendants' uniform conduct.

Therefore, Plaintiff's claims are also typical among the class. *See In re Vitamins Antitrust Litig.*, 209 F.R.D. at 260 ("The typicality requirement is satisfied if each class member's claim arises from the same course of events that led to the claims of the representatives parties and each class member makes similar legal arguments to prove the defendant's liability." (internal quotations omitted)). Accordingly, the proposed class meets the commonality and typicality requirements of Rule 23(a).

### c.  *Adequate Representation*

The final requirement of a Rule 23(a) analysis necessitates that the named plaintiffs, and their counsel, fairly and adequately protect the interests of the purported class. Plaintiff must

demonstrate that the named plaintiff and putative class will "share common objectives and the same factual and legal positions," ensuring that there are no "fundamental" conflicts that go to the "heart of the litigation." *Gunnells*, 348 F.3d at 430-31.

Here, Plaintiff is a businessowner and insured in the Commonwealth of Virginia who holds an "all risk" policy from State Farm. Pl.'s Mem. Supp. at 18. Plaintiff seeks to represent a class of Virginia businessowners and insureds who hold identical State Farm policies, filed claims because of the COVID-19 pandemic closures, and whose claims State Farm denied. *Id.* Notably, Defendants do not challenge the adequacy of Plaintiff's counsel. Upon review, the Court finds no evidence to suggest that the interests of the named Plaintiff in any way contradict that of the purported class. The same goes for Plaintiff's counsel. Accordingly, requirement four of Rule 23(a) is met and Rule 23(a) is satisfied in its entirety.

### d. Ascertainable

"Rule 23 contains an implicit threshold requirement that the members of a proposed class be 'readily identifiable.'" *EQT Prod.*, 764 F.3d at 358 (quoting *Hammond v. Powell*, 462 F.2d 1053, 1055 (4th Cir. 1972)). Defendants claim the proposed class is not ascertainable because it is overly broad and forecloses the ability to ascertain membership in the class without conducting mini trials. Defs.' Mem. Opp. Cert. at 17-18. Yet, Defendants fail to mention that 111 potential class members have already been identified. The Fourth Circuit in *EQT Prod.* concluded that "plaintiffs need not be able to identify every class member at the time of certification." 764 F.3d at 358. Rather, the standard is whether "class members are impossible to identify without extensive and individualized fact-finding or 'mini trials.'" *Id.* (internal citations and quotations omitted). Indeed, unlike in this case, the Fourth Circuit found class certification inappropriate because it did not have "even a rough estimate of the number of potential [class members],"

"little conception of the nature of the proposed class or who may be bound by a potential merits ruling," or "even a rough outline of the classes' size and composition." *Id.* at 359-60.

The proposed class here is fundamentally different. Contrary to Defendants' contentions, the proposed class is more specific and defined than the previous proposed class and 111 potential members have already been identified. Moreover, in their memorandum, Defendants already engaged in analyses identifying Order impact, closure status, and timeline. The Court also notes that State Farm was readily able to identify 111 potential members of the 19,300 Virginia businessowners who purchased the Policy at issue. While the Court at this point in time may not be able to identify every class member, it is not required to. Thus, the Court finds the proposed class is sufficiently defined qualitatively and qualitatively such that it is ascertainable or "readily identifiable." *EQT Prod.*, 764 F.3d at 358.

### 3. Rule 23(b)(3) Certification

Under Rule 23(b)(3), common questions of law or fact "must predominate over any questions affecting only individual members." Further, a plaintiff must establish "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* These requirements are commonly referred to as the *predominance* and *superiority* requirements of a Rule 23(b)(3) analysis.

The predominance requirement establishes a separate and "more stringent" analysis than Rule 23(a)'s commonality requirement. *Thorn*, 445 F.3d at 319 (quoting *Lienhart*, 255 F.3d at 146 n.4); *cf.* FED. R. CIV. P. 23(a)(2) (requiring only the presence of common questions of law or fact). Predominance of common questions over individual issues ensures that the "proposed class[] [is] sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc., v. Windsor*, 521 U.S. 591, 623 (1997). "If the 'qualitatively overarching issue' in the litigation is

common, a class may be certified notwithstanding the need to resolve individualized issues." *Soutter*, 307 F.R.D at 214 (citing *Ealy v. Pinkerton Gov't Servs.*, 514 F. App'x 299, 305 (4th Cir. 2013)); *see also*, *In re Namenda Direct Purchaser Antitrust Litig.*, 331 F. Supp. 3d 152, 204 (S.D.N.Y. 2018) ("'[I]ndividual questions need not be absent' in order to certify a class under Rule 23(b)(3); the text of Rule 23(b)(3) itself contemplates that such questions will be present." (quoting *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015))).

To satisfy the predominance requirement, a plaintiff must demonstrate that each element of the legal claim "is capable of proof at trial through evidence that is common to the class rather than individual." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008), *as amended* (Jan. 16, 2009). "Because the nature of the evidence that will suffice to resolve a question determines whether the question is common or individual, a district court must formulate some prediction as to how specific issues will play out in order to determine whether common or individual issues predominate in a given case." *Id.* (internal quotations and citations omitted). Accordingly, the Court must conduct a "rigorous analysis" of the Rule 23(b)(3) requirements, establishing various facts in support of such analysis. *Id.* at 323–24. In so doing, the Court is required to evaluate "Plaintiffs' methodology for proving [predominance and superiority] and must act as finder of fact *in the face of conflicting expert testimony*." *In re Titanium Dioxide Antitrust Litig.*, 284 F.R.D. 328, 340 (D. Md. 2012), *amended*, 962 F. Supp. 2d 840 (D. Md. 2013) (emphasis added).

### a. Factual Findings Relevant to Plaintiff's Motion

As previously articulated, Plaintiff is a businessowner and insured in the Commonwealth of Virginia who holds an "all risk" Policy from State Farm. Pl.'s Mem. Supp. Cert. at 18. Plaintiff seeks to represent a class of Virginia businessowners and insureds who hold identical

34

State Farm Policies, who were subject to partial or full business suspension under the COVID-19 closure Orders, filed claims accordingly, and whose claims State Farm denied. *Id.* The Policy broadly covers "Loss of Income and Extra Expense Coverage," including such due to accidental direct physical loss to property. Am. Compl. at ¶ 3. Beginning in March 2020, the Commonwealth of Virginia and the federal government issued COVID-19 pandemic closure orders. *Id.* at ¶ 7. As a result, Plaintiff, and other similarly situated business, suspended operations, lost income, and incurred extra expenses. *Id.* Accordingly, Plaintiff filed a claim to Defendants seeking reimbursement for its lost income and extra expenses under the Policy's Loss of Income and Extra Expense Coverage. *Id.* at ₱ 10. However, Defendants denied Plaintiff's insurance claim and refused to provide any reimbursement by claiming that Plaintiff's loss were excluded from coverage. *Id.* at ₱ 11. Plaintiff accuses Defendants of improperly and uniformly denying coverage under the Policy for all members of the class and, thus, allege a breach of contract and breach of the implied covenant of good faith and fair dealing. *Id.* at ₱₱ 12-17.

In support of Plaintiff's theory of liability, Plaintiff alleges that State Farm has uniformly interpreted the "all risk" insurance Policy to exclude coverage for losses stemming from the COVID-19 closure orders for all members of the proposed class. Pl.'s Mem. Supp. Cert. at 3. Moreover, Plaintiff alleges that it will present common evidence showing that businesses in the class purchased the same "all risk" Policy, filed similar claims to State Farm following the COVID-19 closure orders, and that State Farm uniformly denied these claims on the same basis that the "all risk" Policy did not cover the allege losses. *Id.* at 21. In opposition, Defendants allege that the class lacks cohesiveness because "individualized inquiries predominate as to both liability and damages, rendering class certification improper." Defs.' Mem. Opp. Cert. at 20.

### b. Cohesiveness and Predominance

The Court finds that although there may be individualized issues pertaining to specific members of the proposed class, there are common and cohesive legal questions pertaining to all members. *See Seneca Ins. Co. v. Shipping Boxes I, LLC*, 30 F. Supp. 3d 506, 513 (E.D. Va. 2014) (denying motion to dismiss declaratory judgment claims and stating, "declaratory judgment actions by the insured to determine coverage [are] common, and the instant action does not involve inappropriate 'procedural fencing' but rather asks the Court for a construction of definite stated rights, status, and other relations as delineated in the insurance contract"). Specifically, as the Court previously concluded, the following common and cohesive legal questions pertain to all members:

- Whether the term "accidental direct physical loss" in the Policies includes losses resulting from the Orders;

- Whether Plaintiff's and Class members' loss of income and/or extra expenses were caused by a "Covered Cause of Loss" under the Policies;

- Whether the Loss of Income and Extra Expense Endorsements provide coverage for losses stemming from the Orders;

- Whether Defendants breached their contracts of insurance by erroneously interpreting the Policy provisions and wrongfully denying claims for loss of income and/or extra expenses under the Policies;

- Whether Defendants breached their implied covenant of good faith and fair dealing to Plaintiff and members of the Class under the Policies by engaging in a uniform scheme to deny all claims submitted by Class members without conducting any investigations; and

- Whether Plaintiff and Class members were damaged by Defendants' conduct.

Further, to grant certification under Rule 23(b), the Court must determine whether the alleged Counts in the Amended Complaint are predominant for the class or individual. Accordingly, the Court will examine each count in turn.

### i. Breach of Contract

In Count II of the Amended Complaint, Plaintiff alleges breach of contract individually and on behalf of the class. *See* Am. Compl. at ¶¶ 160-172. To succeed on their breach of contract claim at trial, Plaintiff must establish the following elements: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148 (2009). As detailed in its Memorandum Opinion and Order regarding Defendants' Motion to Dismiss, the Court found that Plaintiff had alleged sufficient facts to state a claim. *See* Dec. Mem. Op. & Order at 7-21

First, both parties do not dispute that there was a legally enforceable contract. However, the key issue in dispute here is whether Defendants breached its obligation to provide coverage for losses stemming from the COVID-19 closure orders. After applying rules of contract interpretation from the Commonwealth of Virginia, the Court previously examined the "all risk" policy and found that Plaintiff alleged sufficient facts to establish that it submitted a good faith plausible claim to the Defendants for a "direct physical loss" covered by the policy. *Id.* at 20. Therefore, the burden shifted to the Defendants to show that Plaintiff's claim was excluded under the contract. *Id.* at 22. Accordingly, the Court determined that Plaintiff pleaded sufficient facts that neither the Virus exclusion, ordinance or and law exclusion, nor the acts or decisions exclusion applied to bar Plaintiff's claim. *Id.* at 23-28.

In support of the instant Motion, Plaintiff asserts that the "central issue" for the breach of contract claim is "whether State Farm breached its obligation to pay coverage for loss of income and extra expenses in the event of business interruption in the manner promised in the Policies." Pl.'s Mem. Supp. Cert. at 21. They purport that "[t]his issue applies to all Class members and

will be proved with common evidence." *Id.* Since the proposed class is similarly situated as the Plaintiff, the Court also finds that the relevant facts required to prove a claim for the Plaintiff, as an individual, are substantially similar as those required to prove a claim for the proposed class. Thus, the Court finds that Plaintiff's and the proposed class members' breach of contract claims all involve the same legally enforceable contract, the same question of whether Defendants breached that contract by uniformly denying their claims, and, if so, the same question of whether Defendants' breach caused Plaintiff and the proposed class injury or damage. *Sunrise*, 277 Va. at 148. Accordingly, the questions of fact and law required to establish Count II for the proposed class are predominate across each member of the purported class.

### ii. Breach of Covenant of Good Faith and Fair Dealing

In Count III, Plaintiff alleges a claim for Breach of Covenant of Good Faith and Fair Dealing. Am. Compl. at ¶¶ 173-76. Under Virginia law, the elements of a claim for breach of an implied covenant of good faith and fair dealing are "(1) a contractual relationship between the parties, and (2) a breach of the implied covenant." *Enomoto v. Space Adventures, LTD*, 624 F.Supp.2d 443, 450 (E.D.Va. 2009) (citing *Charles E. Brauer Co., Inc. v. NationsBank of Va., N.A.*, 466 S.E.2d 382, 386 (Va. 1996). As noted previously, the Court noted that Plaintiff pleaded sufficient facts to plausibly establish that it was covered by the "all risk" policy. Dec. Mem. Op. & Order at 29-30. Accordingly, the Court reasoned that since "coverage is a pre-requisite to a claim for bad faith" Plaintiff may proceed with Count III. *Id.* (citing *Builders Mut. Ins. Co. v. Dragas Mgmt. Corp.*, 709 F. Supp. 2d 432, 441 (E.D. Va. 2010) (noting that "coverage is a prerequisite to a claim for bad faith")).

In support of the instant Motion, Plaintiff asserts that the breach of good faith and fair dealing claim "focuses on State Farm's unreasonable conduct in developing a uniform scheme to

deny all Class members' claims based on a wrongful interpretation of Policy Provisions in order to limit its liability to the detriment of its insureds." Pl.'s Mem. Supp. Cert. at 22. As with the breach of contract claim, Plaintiff purports that this claim will be "proven with common evidence." *Id.* at 22-23 (listing sealed examples of evidence Plaintiff plans to use). Accordingly, the questions of fact and law required to establish Count III for the proposed class predominate across each member of the purported class.

### c. *Measurable Damages*

At the class certification stage, Plaintiff must show, by a preponderance of the evidence, that they will be able to prove damages using common proof. *See Behrend*, 655 F.3d at 204. However, "[s]ome variation of damages among class members does not defeat class certification." *Id.*; *see also* 7AA Federal Practice & Procedure § 1781 ("[I]t uniformly has been held that differences among the members as to the amount of damages incurred does not mean that a class action would be inappropriate."). But notably, "[c]omplex and individualized questions of damages . . . weigh against finding predominance." *Id.* A potential "need to inquire into individual damage calculations, however, is not an impediment to class certification" since a damages inquiry necessarily requires individual proof. *In re Titanium*, 284 F.R.D. at 349; *see also Gunnells*, 348 F.3d at 427–28 ("Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification. In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations."). Indeed, the Fourth Circuit opined that "Rule 23(c)(4) permits courts to certify a class with respect to particular issues and contemplates possible class adjudication of liability issues with 'the members of the class [that are thereafter] required to come in individually and prove the amounts of their respective claims.'" *Gunnells*,

348 F.3d at 428 (citing Fed. R. Civ. P. 23 advisory committee's note (1966 Amendment, subdivision (c)(4))).

Here, Plaintiff asserts "damages are capable of measurement through a classwide [sic] methodology." Pl.'s Mem. Supp. Cert. at 23. Specifically, Plaintiff states that its expert, Jeffrey Meyers, "has developed a common methodology that can be used to calculate the loss of income and extra expense for Plaintiff and all Class members under the Policies." *Id.* This methodology consists of a seven-step process: (1) Calculate the "But For" Revenue; (2) Calculate the "But For" Operating Expenses; (3) Calculate the "But For" Net Income; (4) Determine the Actual Revenue; (5) Calculate Net Income under the Policy; (6) Determine the Continuing Operating Expenses; and (7) Calculate the Loss of Income. *Id.* Plaintiff concludes that this methodology can be applied class-wide "to calculate the loss of income and/or extra expenses to which each Class member is entitled under the Policies and is consistent with Plaintiff's and Class members' theory of liability and common injuries." *Id.* at 25. Defendants respond challenging Meyers' qualification and the reliability of his methodology, which essentially reiterates their Motion to Exclude. Defs.' Mem. Opp. Cert. at 25-28. As with Defendants' Motion to Exclude, the Court finds Defendants' arguments on this issue to be unavailing.

The Court acknowledges that while it is possible that each proposed class member was injured by Defendants' alleged violation, the extent of that injury may differ depending upon the specific losses and extra expenses incurred by each businessowner during their closures. Again, however, a potential "need to inquire into individual damage calculations . . . is not an impediment to class certification" since a damages inquiry necessarily requires individual proof. *In re Titanium*, 284 F.R.D. at 349; *Gunnells*, 348 F.3d at 427–28. Accordingly, the Court finds that Plaintiff has shown, by a preponderance of the evidence, that they will be able to prove

40

damages using common proof. *See Behrend*, 655 F.3d at 204.

### d. Superiority

Finally, Plaintiff must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The superiority requirement ensures that proceeding by class action will "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable consequences." *Amchem Prods., Inc.*, 521 U.S. at 615. Pertinent to this inquiry are (A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. *See* FED. R. CIV. P. 23(b)(3)(A)-(D).

Defendants contest superiority by arguing that individual actions are feasible, and Plaintiff's claims raise predominating individual issues. Defs.' Mem. Opp. Cert. at 29. For all relevant aforementioned reasons, Defendants' second argument is unpersuasive. In support of its argument that individual actions are feasible, Defendants list a variety of cases filed in Virginia state and federal courts where insured businesses have sought coverage for business interruption claims. *Id.* Yet, they fail to identify if any of these actions involve themselves or any proposed class members. Moreover, the question is not whether individual actions are "feasible" but whether a class action is economical and efficient. Here, the Court finds that Plaintiff has plausibly alleged that at least or about 111 policyholders in Virginia have been impacted by Defendants' alleged wrongdoing. To resolve these claims, it would require potentially dozens of

minitrials throughout this Circuit and sister circuits. In the interest of efficiency, time, and uniformity of decision, and because the Court also finds that common issues predominate, class action treatment is superior to any alternative means of adjudication.

### 4. Request to Defer Contact Information and Class Notice

Defendants request the Court defer ordering the disclosure of contact information and notice to class members given the privacy considerations of the putative class members. Defs.' Mem. Supp. at 30. Defendants also request this time to have a "meaningful opportunity" for their apparently inevitable appeal to the Fourth Circuit. *Id.* Yet, Defendants cite no authority and provide no explanation as to why this is warranted. The Court does not find that either of these reasons warrant deferring the disclosure or notice requirements under Rule 23(c)(2)(B), and that doing so would unnecessarily delay litigation. Accordingly, Defendants' request is **DENIED**.

## IV.    CONCLUSION

For the reasons set forth above, Defendants' Motion to Exclude is **DENIED**, Plaintiff's Motion to Exclude is **GRANTED IN PART**, and Plaintiff's Motion for Class Certification is **GRANTED**. The Court **ORDERS** certification of the following class:

> All persons or entities in the Commonwealth of Virginia with a Businessowners insurance policy issued by State Farm on Form CMP-4100, including a Loss of Income and Extra Expense endorsement on Form CMP 4705.1 or CMP 4705.2, in effect at any time between March 23, 2020 and June 30, 2020 (the "Closure Period"), that were subject to partial or full business suspension under the Orders[9] and submitted claims for business income losses and/or extra expenses incurred during the Closure Period that were denied by Defendants (the "Class").[10]

---

[9] The Orders include: EO 53 (March 23, 2020); EO 55 (March 30, 2020); Amended EO 53 (April 15, 2020); Second Amended EO 53 (May 4, 2020); EO 61 (May 8, 2020); EO 62 (May 12, 2020); Amended EO 62 (May 14, 2020); Amended EO 61 (May 20, 2020); Second Amended EO 61 (May 28, 2020); Third Amended EO 61 (June 2, 2020); EO 65 (June 2, 2020); and Amended EO 65 (June 9, 2020) (the "Orders").

[10] The following are excluded from the Class: (a) all Judges who have presided over the Action and their spouses; (b) all current employees, officers, directors, agents, and representatives of Defendants, and their family members; (c) any affiliate, parent or subsidiary of Defendants and any entity in which Defendants have a controlling interest; (d) any person or entity who settled with and released Defendants from any pending cause of action that

**IT IS FURTHER ORDERED** that the following issues relating to claims and/or defenses present common class-wide questions:

- Whether the term "accidental direct physical loss" in the Policies includes losses resulting from the Orders;

- Whether Plaintiff's and Class members' loss of income and/or extra expenses were caused by a "Covered Cause of Loss" under the Policies;

- Whether the Loss of Income and Extra Expense Endorsements provide coverage for losses stemming from the Orders;

- Whether Defendants breached their contracts of insurance by erroneously interpreting the Policy provisions and wrongfully denying claims for loss of income and/or extra expenses under the Policies;

- Whether Defendants breached their implied covenant of good faith and fair dealing to Plaintiff and members of the Class under the Policies by engaging in a uniform scheme to deny all claims submitted by Class members without conducting any investigations; and

- Whether Plaintiff and Class members were damaged by Defendants' conduct.

**IT IS FURTHER ORDERED** that Elegant Massage, LLC d/b/a Light Stream Spa is appointed as representative of the Class, and Kessler Topaz Meltzer & Check, LLP, Carella, Byrne, Cecchi, Olstein, Brody & Angello, P.C. and Glasser and Glasser, P.L.C. are appointed as Class Counsel;

**IT IS FURTHER ORDERED** that Defendants shall provide to Plaintiff's counsel the names, last known addresses, home and mobile phone numbers, and email addresses of all potential members of the certified class within **FIFTEEN (15) DAYS** of the date of this Order;

**IT IS FURTHER ORDERED** that Plaintiff's counsel shall circulate notices of pendency and consent to joinder to all potential members of the certified Class upon the Court's approval of the form of notice;

---

was asserted in Plaintiff's Amended Class Action Complaint.

43

**IT IS FURTHER ORDERED** that the filing of all dispositive motions shall be **STAYED** until further notice of this Court.

The Court **DIRECTS** the Clerk to provide copies of this Memorandum Opinion and Order to counsel of record.

**IT IS SO ORDERED.**

Norfolk, Virginia
February _____, 2022

UNITED STATES DISTRICT JUDGE